**Anselmo and Jacqueline DIMA et al., Plaintiffs,**

v.

**Frank J. MACCHIAROLA et al., Defendants.**

**No. CV–80–2848.**

United States District Court, E. D. New York.

Feb. 17, 1981.

MEMORANDUM OF DECISION
AND ORDER

COSTANTINO, District Judge.

The plaintiffs, parents and guardians of handicapped students formerly attending The Harlyn School ("Harlyn"), filed this action and alleged an improper transfer of Harlyn Students to other schools in violation of the Education of All Handicapped Children Act of 1975 ("EHA"), 20 U.S.C. § 1401 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Civil Rights Act, 42 U.S.C. § 1983, and various provisions of the New York Education Law ("N.Y.Educ. L.").

The defendants herein are as follows: Frank J. Macchiarola, the Chancellor of the New York City Board of Education ("Board"); Jerry C. Gross, the Board's Executive Director of the Division of Special Education; Gordon M. Ambach, the Commissioner of the Education Department of the State of New York ("State Education Department"); Louis Grumet, the State Education Department's Assistant Commissioner for the Education of Children with Handicapping Conditions; and Harlyn.

Plaintiffs seek both preliminary and permanent injunctive relief to allow these handicapped students to remain at Harlyn pending due process hearings which plaintiffs contend should be held pursuant to Section 1415 of the EHA and Sections 4402(1)(b)(1) and 4404 of the N.Y.Educ.L. These statutes permit parties under certain circumstances to question, in a due process forum, the transfer of any handicapped student from one facility to another while allowing the student subject to such transfer to remain in the same facility until the due process procedures are exhausted. Further, the plaintiffs request the following additional relief: that Harlyn be approved by the State Education Department as a facility for the placement of handicapped children; that the preliminary audit by the Board which led to the Board's refusal to contract with Harlyn for the 1980–81 school year be set aside as improper; and, that Harlyn be publicly funded by the Board and the State Education Department while plaintiffs are pursuing their due process remedies. For reasons stated below, the entire suit is dismissed for failure to state a claim upon which relief can be granted and for failure to exhaust administrative remedies.

*Background*

Pursuant to the requirements set forth in the EHA, 20 U.S.C. § 1401 *et seq.*, local school districts must apply to the federal government for funds to educate the handicapped, and as a condition for receiving such funds, they are obliged to provide "free appropriate public education" to the handicapped which meets the unique needs of all handicapped children. 20 U.S.C.

§§ 1401(18), 1412.[1] *See* S.Rep.No.94–168, 94th Cong., 1st Sess. 26 (1975), *reprinted in* [1975] U.S.Code Cong. & Admin.News pp. 1425, 1450. To this end, local school districts like the Board contract with non-public educational institutions to educate these students when they are unable to provide an "appropriate" educational placement for each handicapped child. N.Y.Educ.L. §§ 4401(2) and 4402(2).[2] Both the Board and the State Education Department receive federal assistance under 20 U.S.C. § 1401 *et seq.*, and consequently must comply with the mandates of the EHA.

Since 1973, Harlyn has been certified by the State Education Department as an approved private institution for the placement and education of handicapped children. In August of 1973 and October of 1976, Harlyn and the State Education Department agreed that Harlyn would provide instruction for handicapped students during the 1973–74 school year and subsequent school years. The Board and Harlyn then entered into two similar enrollment agreements in December, 1976 and in May, 1978. Since that time, the students placed by the Board accounted for the lion's share of those enrolled at Harlyn. The school thus depended upon the tuition generated from these students to remain in existence. The Board's decision not to offer a contract to Harlyn for the 1980–81 school year affected approximately 160 handicapped students, including approximately 120 students placed at Harlyn by the Board.

On or about July 8, 1980, the Board completed a preliminary audit of Harlyn's finances and educational programs for the school years 1977–78 and 1978–79. This audit allegedly revealed mismanagement by Harlyn of large sums of public monies and serious educational deficiencies in the programs offered. In addition, the audit indicated that monies were due and owing to both the State and the Board for past overpayments to Harlyn. After evaluating the facts revealed in the audit, the Board resolved not to sign a contract with Harlyn for the 1980–81 school year. The State Education Department, aware that Harlyn could not reopen without obtaining public funds through a contract with the Board, also terminated its enrollment agreement on July 30, 1980; the State assured Harlyn, however, that if Harlyn guaranteed that it could provide special education services for the 1980–81 year, it would be willing to negotiate a contract for the current year. Since Harlyn failed to reach an agreement with the Board, the funds necessary for Harlyn's operation were unavailable and the school never opened for classes in September, 1980. The State Education Department thereafter removed Harlyn from the list of private schools it approved for the education of handicapped children. In essence, the State thought it imprudent to retain a school on the approved list which neither appeared likely to open for that year nor was currently operating, and which could not insure prompt repayment of the amounts owed to the State. (*See* Grumet Aff.)

In a letter dated August 29, 1980, the Board notified the parents and guardians of the students scheduled to attend Harlyn that the Board had not signed a contract with Harlyn due to both its fiscal and educational deficiencies, and that each child was or would shortly be offered an alternate education site. Although the parents and guardians were permitted to discuss

---

1. In New York's efforts to comply with the mandates of the EHA, 20 U.S.C. § 1401 *et seq.*, section 4402(1)(b)(1) of the N.Y.Educ.L. provides for the establishment of Committees on the Handicapped ("COH") in each school district who evaluate the status of each handicapped child, N.Y.Educ.L. § 4402(1)(b)(2), and make recommendations to local school boards regarding a handicapped child's placement. N.Y.Educ.L. § 4402(1)(b), (3)(b). Section 4404 of the N.Y.Educ.L. sets forth the appeal procedures to be followed in the event a parent or guardian disagrees with the decisions of a COH concerning the education of the handicapped child, which are to be put in effect by the local school board.

2. Section 4402(2)(b)(1) of the N.Y.Educ.L. provides that the Board and the State are authorized to contract directly with private entities for the education of handicapped children when it deems them appropriate.

this decision with the Board in an open meeting held at Harlyn, they were never afforded the full opportunity to question or challenge the Board's decision in a due process forum. This suit was filed when the plaintiffs concluded that the reassigned sites did not provide adequate programs to meet the individual needs of each child, whereas Harlyn educated their children to their satisfaction. In contesting the Board's failure to contract with Harlyn, plaintiffs argued that the Board's reassignment decision was not implemented in accordance with the due process procedures set forth in Section 1415 of the EHA and therefore should be vacated, and that pending any determination concerning the reassignment, the students should be permitted to remain at Harlyn at public expense.

*CONCLUSIONS OF LAW*

Section 1415 of the EHA was promulgated by Congress to insure that decisions concerning the education of the handicapped were made fairly and with the appropriate input of parents and guardians.[3] *See Vogel v. School Board*, 491 F.Supp. 989 (W.D.Mo. 1980); *Eberle v. Board of Pub. Educ.*, 444 F.Supp. 41 (D.Pa.1977), *aff'd* 582 F.2d 1274 (3d Cir. 1978). More specifically, it requires that every local educational agency afford a party the following relief prior to the transfer of a student: prior written notice to the child's parents or guardian of a proposed change in the educational placement of a child, 20 U.S.C. § 1415(b)(1)(C); the right to present complaints with respect to any such change, 20 U.S.C. § 1415(b)(1)(E), at an impartial due process hearing, 20 U.S.C. § 1415(b)(2); the right to appeal such decision to the state education agency, 20 U.S.C. § 1415(c), and ultimately to the state or federal court, 20 U.S.C. § 1415(e)(2); and the right to have the child remain in the "then current educational placement" while these proceedings are pending. 20 U.S.C. § 1415(e)(3) ("status quo" provision).[4]

■ The major question herein is whether the transfer of these handicapped students, caused solely by the Board's refusal to contract with Harlyn, constituted a change in "placement" as set forth in 20 U.S.C. § 1415(b)(1)(C) sufficient to trigger the prior notice and hearing requirements of Section 1415. Drawing on the analysis in a recent decision by the Supreme Court which rejected a similar request in a suit involving the complete transfer of medical assistance recipients from a decertified nursing home, *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), the action ap-

3. There is significant interplay between the EHA and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 provides that:

"No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance."

Federal regulations have been promulgated on the basis of Section 794 that are applicable to state and local education departments receiving financial assistance from the federal government. See 45 CFR 84–31 *et seq.* In addition to requiring that the recipients provide free appropriate education to handicapped children residing in the recipients locale, 45 CFR 84.31–84.39, Section 84.36 of Title 45 of the CFR provides that:

"A recipient that operates a public elementary or secondary education program shall establish and implement, with respect to actions regarding the identification, evaluation or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents and guardian and representation by counsel, and a review procedure. Compliance with the procedural safeguards of Sec. 615 of the Education of the Handicapped Act [20 U.S.C. § 1415] is one means of meeting this requirement.

Since the Board and the State Education Department are recipients of federal funds, any improper change in placement under 20 U.S.C. § 1415(b)(1)(C) would likewise result in a violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

4. The New York counterpart of the EHA's status quo provision, 20 U.S.C. § 1415(e)(3), is contained in N.Y.Educ.L. § 4404(4).

pears to be wholly without merit as the plaintiffs have failed to establish the existence of an injury capable of redress. Mindful that under normal circumstances "a decision to transfer a handicapped child from a special class in a regular school to a special school would involve the sort of fundamental alteration in the child's education requiring prior parental notification under § 1415(b)," *Concerned Parents & Citizens For The Continuing Education at Malcolm X (P.S. 79) v. Board of Education* ("Malcolm X"), 629 F.2d 751, 754 (2d Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981), the outright transfer of the students in this instance is not a change in "placement" within the meaning of the statute, and thus, the due process procedures set forth in Section 1415 need not be applied.

In *O'Bannon,* the Nursing Center had been certified as a skilled nursing facility by the Department of Health, Education, and Welfare ("HEW") and the Pennsylvania Department of Public Welfare ("DPW"), and as such, became eligible to receive payments from HEW and DPW for the care of persons entitled to Medicare and Medicaid benefits under the Social Security Act. Subsequently, HEW decertified the Nursing Center, informed the facility that no additional payments would be forthcoming, and as a consequence of the decertification, transferred all Medicare and Medicaid residents to a certified facility. In objecting to the transfer, the transferred patients contended that Medicaid regulations granted them the "property right to remain in the home of their choice absent good cause for transfer" and that any transfer "entitle[d] them to a hearing on whether such cause exist[ed]." *Id.,* 447 U.S. at 779–786,

100 S.Ct. at 2472–2476. In holding that the patients have no such right, the *O'Bannon* court observed that

> it is important to remember that this case does not involve the question whether HEW or DPW should, as a matter of administrative efficiency, consult the residents of a nursing home before making a decision to decertify it. Rather the question is whether the patients have an interest in receiving benefits for care in a particular facility that entitles them, as a matter of constitutional law, to a hearing before the Government can decertify the facility. *Id.,* 447 U.S. at 780, 100 S.Ct. at 2473 (footnotes omitted).

While a recipient has the right to remain in any facility which continues to be certified, the court ruled that he has no right "to enter an unqualified home and demand a hearing to certify it," *id.,* 447 U.S. at 784, 100 S.Ct. at 2475, and has no right "to continue to receive benefits for care in a home that has been decertified." *Id.* In refusing to curtail the right of the Government to decertify a facility when it failed to meet Government standards, the *O'Bannon* court noted that

> [A]lthough decertification will inevitably necessitate the transfer of all those patients who remain dependent on Medicaid benefits, it is not the same for purposes of due process analysis as a decision to transfer a particular patient or to deny him financial benefits, based on his individual needs or financial situation. *Id.* at 447 U.S. at 784, 100 S.Ct. at 2475.

■ Turning to the facts in the instant proceeding, it is clear to this court that the Board's decision not to contract with Harlyn on the basis of its audit[5] was poorly

5. As noted above, the Board completed the "Preliminary Draft Audit" for the school years 1977–78 and 1978–79 on July 8, 1980. Both plaintiffs and Harlyn contend that the audits were not conducted in accordance with the practice and procedures used by the State Education Department in similar audits. Moreover they allege that the focus of the audit was misguided in that it did not concentrate on the superior quality of Harlyn's educational programs and fails to credit the substantial assist-

ance provided to the infant plaintiffs. Finally, the plaintiffs and Harlyn conclude that the audit was performed pursuant to a Board policy to use any available excuse to shut down private schools so that the handicapped students will eventually be placed in public schools.

While the court does not take issue with either side, the affidavit of Richard Crawley, dated October 21, 1980, indicates that there existed numerous educational deficiencies at Harlyn. In response to plaintiffs' allegations

planned and caused numerous placement difficulties for both the plaintiffs and the Board. Moreover, had the decision been made prior to July or August of 1980, the transition from Harlyn to alternative placements would have been less shocking and dramatic for these handicapped children. Regardless of this lack of foresight, this court cannot sit in judgment of the Board's refusal to contract with Harlyn and will not permit these plaintiffs to challenge that decision collaterally.[6] *See O'Bannon v. Town Court Nursing Center, supra.* Congress promulgated Section 1415 with its due process safeguards to insure that no child would be misclassified as "having handicapping conditions when, in fact, they do not have such conditions." S.Rep.No.94–168, 84th Cong., 1st Sess. 26 (1975), *reprinted in* [1975] U.S.Code Cong. & Admin.News 1450–51; *see Malcolm X, supra.* Congress never intended to expand these classification safeguards to obstruct a decision by the Board or the State to retain or discard the services of a private school. Rather, the Board and the State have the right to refuse to continue to employ a private institution when, in their discretion, they believe that employment to be inappropriate. *Cf. Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). While the Board and the State do not possess unfettered power in all cases "to close schools and transfer students," *Malcolm X, supra,* 629 F.2d at 256, they must be permitted to make an independent determination regarding the suitability of private institutions to fulfill the educational and fiscal needs of the system without first according the parents and guardians a due process forum. *See Windward School v. State of New York,* 78 Civ. 3484 (S.D.N.Y.1978) (n. o. r.), *aff'd,* Docket No. 79–7193 (2d Cir. 1979) (n. o. r.); 20 U.S.C. § 1413(a)(4). Accordingly, if a decision by either the Board or the State Education Department results in the removal of all handicapped students from the privately owned facility, as opposed to an individual transfer, this would not trigger the prior notice and hearing requirements of Section 1415 of the EHA. *O'Bannon v. Town Court Nursing Center, supra.*

Moreover, for this court to fashion a remedy to the plaintiffs' satisfaction, it would have to direct the Board to contract with Harlyn on an interim basis to allow the handicapped students to remain at Harlyn while the plaintiffs challenged the "placement" change through local administrative forums. This line of reasoning was rejected in both *O'Bannon v. Town Court Nursing Center, supra* and in *Winward School v. State of New York, supra,* and must be rejected here since neither statutory authority nor legislative history exists to sup-

that the Board's conclusions regarding fiscal inproprieties were without basis, paragraph 32 of the first affidavit of George Shibitz set forth below lists a portion of the alleged inproprieties:

(a) Harlyn charged tuition rates substantially in excess of its operating costs per student.
(b) Harlyn compensated its two principals ($72,400 each for fiscal year 1978, and $69,600 each for fiscal year 1979) substantially in excess of the amount allowed by its contract with the Board.
(c) Harlyn submitted bills and received tuition payments for children who had either been discharged from Harlyn or who had never attended Harlyn during the particular contract year.
(d) Harlyn was unable to provide sufficient documentation for a portion of expenditures in several expense categories.
(e) Harlyn leased luxurious automobiles as "school vehicles" in direct contravention of its contract with the Board.

(f) Senior directors and other supervisors of the educational program at Harlyn, as of November 19, 1979 were neither licensed nor certified in School Administration or Supervision.

**6.** This court lends no credence to the Board's position that even if it chose to offer a new contract to Harlyn, it could not do so because Harlyn is no longer on the State Education Department's list of schools approved for the education of handicapped children. The Board's decision not to offer Harlyn a contract for the school year 1980–81 was the direct cause of the fiscal problem which subsequently led to Harlyn's failure to open; to argue otherwise detracts from the other valid points set forth by the Board. If the Board agreed to offer Harlyn a contract, Harlyn would undoubtedly be replaced on the State Education Department's approved list.

port this result. This court concludes, therefore, that the transfer of these students from Harlyn did not trigger the due process mandates of Section 1415(b) and that portion of the complaint which challenges the Board's reassignment decision and requests that the Board be directed to contract with Harlyn pending the exhaustion of their due process remedies is dismissed.

■ The balance of plaintiffs' complaint which alleges that the alternate sites are not meeting the needs of the handicapped children is also dismissed for failure to exhaust administrative remedies. *See Touche Ross & Co. v. Securities and Exchange Commission,* 609 F.2d 570 (2d Cir. 1979). Under 20 U.S.C. § 1415(b)(1)(E) and 1415(b)(2)–(e), each parent and guardian of a handicapped child is afforded ample opportunity to present complaints concerning a child's current placement to a local agency, and that agency must afford these complainants a full administrative hearing with the right to appeal any adverse decision to the state or federal court. *Malcolm X, supra,* 629 F.2d at 756; *Harris v. Campbell,* 472 F.Supp. 51 (E.D.Va.1979). The procedures set forth in 20 U.S.C. § 1415 were established to cover exactly the problems alleged herein and it would be inappropriate at this point for this court to make a determination regarding the propriety of the placement that the plaintiffs' children are now attending without first allowing the Board or the State Education Department the opportunity to rectify the problem. The remainder of the complaint therefore is likewise dismissed.

Accordingly, the action is dismissed.

So Ordered.