975 F.2d 193
 77 Ed. Law Rep. 665
 SHERRI A.D., ETC., ET AL., Plaintiffs-Appellants,
v.
W.N. KIRBY, Commissioner Of Education Of The Texas Education
Agency, Individually And In His Official Capacity,
ET AL., Defendants,
and
Texas Education Agency and Texas School For The Blind And
Visually Impaired (Formerly Texas School For The
Blind), Defendants-Appellees.
 Nos. 91-8113, 92-8056.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 19, 1992.
 
 Dona G. Hamilton and Tammy L. Stroud, Asst. Attys. Gen., Dan Morales, Atty. Gen., Cynthia D. Swartz, Henslee, Ryan & Groce, Austin, Tex., for defendants-appellees.
 Lou Bright and J.D. Hooper, Asst. Attys. Gen., Kevin O'Hanlon, TEA, Austin, Tex., for defendants.
 Nicholas Serna, Legal Aid Soc. of Cent. Texas, John M. Torti, Belton, Tex., for plaintiffs-appellants.
 Appeals from the United States District Court for the Western District of Texas.
 Before GOLDBERG, HIGGINBOTHAM and DAVIS, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 With reluctance, we will engage seasoned combatants in the war over the future welfare, education and happiness of a young woman with multiple handicaps. The dispute dates back to the birth of Sherri, A.D., at which time her parents discovered that she was blind, deaf, and mentally retarded. Unwilling or unable to care for the infant, they left her in the custody of her aging grandmother. When Sherri reached age six, the Cameron, Texas school district decided it would pay for her education, but would not itself attempt to teach her. Together, the school district and the grandmother sought and obtained Sherri's admission to a residential school for handicapped persons.
 
 
 2
 Sherri had lived for seven years at the Texas School for the Blind and Visually Impaired in Austin, Texas, when that institution, together with the state education agency, formulated new admissions standards to which Sherri did not measure up. Vigorous disputation took place regarding whether Sherri should be moved, and if so, where. Many parties wanted a voice in the decision regarding where Sherri should live and attend school, but no one seemed to want the responsibility of housing and educating her themselves.
 
 
 3
 Sherri's grandmother sought the assistance of legal counsel, who five years ago filed suit in United States District Court, presenting many grievances, and a request for certification of a class action. The district judge referred the case to a magistrate judge for decision. The referral was one of the last things on which the combatants were able to agree.
 
 
 4
 The war intensified, each combatant hauling out increasingly heavy artillery in the hope of vanquishing his opponents. At one point, the list of drafted warriors spanned ten pages. Eventually, many of the soldiers retreated or were excused from the fight. Five years into the war, the only combatants remaining on the battlefield were the grandmother, the guardian ad litem, the Texas Education Agency, and the Texas School for the Blind and Visually Impaired. These parties temporarily lost their taste for battle, and sought a truce. Each removed his heavy armor, and sat down at the same table. However, they were unable to reach a compromise.
 
 
 5
 Unlike King Solomon, the magistrate judge cannot resolve this dispute by giving the child to the person who seems most interested in her welfare. Although many are solicitous for her, no one particularly wants Sherri--not her parents, not her grandmother, not the regular schools, not the special schools, and not many of the alternative facilities which have been explored to date. It is a strange battle indeed in which the combatants fight not to obtain possession of the prize, but to foist it off upon someone else.
 
 
 6
 The combatants have once again taken up their battle stations, and appear determined to fight on valiantly at all costs. We shall venture forth from the relative calm of our bunker, hoping to infiltrate the redoubts and ramparts of the contenders. We shall attempt at all times to bear in mind the welfare of Sherri A.D. First, we shall summarize the legal issues and our conclusions.
 
 
 7
 Plaintiff Sherri A.D., through her guardian and grandmother Nell D., appeals from an interlocutory order of a United States magistrate judge, [February 5, 1991 Order, hereafter "February Order"] requiring that she be transferred from an institution for the visually impaired to a community placement as soon as one can be located or appropriately tailored to fit Sherri's needs. Plaintiff also appeals interlocutory orders denying a stay of the February Order, finding the parties in contempt, ordering mediation and setting a hearing on the matter of contempt.[1] Although it appears that plaintiff did not file notice of appeal on the appointment of a guardian ad litem, she requests that we address that matter as well. Moreover, on March 29, 1991, an order granting plaintiff's motion to permit appeal on the question of class certification was granted by the United States magistrate judge, although in an order dated June 26, 1991, the magistrate judge declined to certify that the plaintiff's class action claims were not frivolous.
 
 
 8
 Finding that we have jurisdiction to consider the appeal of the February Order, we affirm the magistrate judge's directive that Sherri A.D. be moved from the Texas School for the Blind and Visually Impaired to community-based housing, and that she receive free, appropriate education in her local public school district until her eligibility for public education expires.
 
 
 9
 Because we believe that the other matters plaintiff urges us to address on interlocutory appeal present no threat of irreparable harm, and do not relate to any conclusive collateral order separable from the merits of plaintiff's claims, we decline to reach them. Although the record is already voluminous, the district court is in a better position than we are to assess the merits of these other claims, all of which can be appealed after entry of judgment without prejudice to any of the parties.
 
 I. BACKGROUND
 
 10
 Twenty year-old Sherri A.D. is profoundly mentally retarded, deaf and blind. In 1987, a special education hearing officer found that Sherri functioned cognitively at the level of a child aged eight to twelve months. Plaintiff now claims that Sherri functions at the level of a child aged sixteen to twenty-two months.
 
 
 11
 The special education hearing officer who reviewed her case in 1987 determined that "Sherri might reasonably be expected to progress at an extremely slow rate and will exit public education at age twenty-two[2] functioning at the cognitive level of a small child." All parties to this action agree that an appropriate educational program for Sherri should include motor development, communication, socialization and recreational components. Emphasis must be placed on assisting Sherri to develop independence in the activities of daily living, such as toileting, washing, and eating.
 
 
 12
 It is unclear from the record where Sherri lived from birth to age six. It appears, however, that she was not institutionalized, although she functioned then, as now, at the cognitive level of a one to two year-old child. In 1978, an "admission, review and dismissal committee" ["ARD"] of Sherri's local public school district ["School District"] decided to place Sherri at the Texas School for the Blind and Visually Impaired ["School for the Blind"], the only residential institution in Texas established for the specific purpose of educating blind and visually impaired people at public expense until they attain age twenty-two.
 
 
 13
 In 1985, the School for the Blind and the Texas Education Agency ["TEA"] developed new eligibility criteria for students at the School for the Blind. The School for the Blind then notified Sherri's School District that Sherri might no longer be eligible for continuing admission to the School. On March 14, 1986, an ARD convened at the School for the Blind determined that Sherri did not meet the new eligibility criteria and should be returned to a community placement and educated by her local School District. Representatives of the School District initially agreed, but soon changed their position for reasons not revealed in the record.
 
 
 14
 On March 27, 1986, Sherri's grandmother, Nell D., acting as Sherri's guardian and next friend, requested a due process hearing under the Education for All Handicapped Children Act ["EAHCA"].[3] Following the hearing, the School District convened two ARDs to decide whether the March 14, 1986 ARD had reached the correct decision. The ARDs convened by the School District found that the School for the Blind was the least restrictive placement available to accommodate Sherri's needs.
 
 
 15
 Because the School District's ARDs reached a different decision than did the ARD convened at the School for the Blind, and because Nell D. did not believe she could care for Sherri at home, Nell D. appealed to a special education hearing officer, alleging that the School for the Blind's eligibility criteria were discriminatory or otherwise unlawful, and that the School for the Blind was the least restrictive environment in which Sherri could receive free, appropriate special education services to which she is entitled until age twenty-two. A hearing was held over the course of sixteen calendar days in late 1986 and early 1987.
 
 
 16
 On September 1, 1987, the special education hearing officer rendered a decision, finding that under Board of Educ. of Hendrick Hudson Cent. School Dist., Westchester County v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), Sherri's placement at the School for the Blind was "appropriate," because Sherri obtained "educational benefit" from services provided there. However, the special education hearing officer found that Sherri should nevertheless be transferred from the School for the Blind to a community placement, because the School for the Blind was not the least restrictive environment in which Sherri could receive specialized education services from which she would obtain educational benefit.
 
 
 17
 The hearing officer noted that the record "clearly reflect[ed]" that the School District had placed Sherri at the School for the Blind with the intent of "leaving the child in the charge of that facility for the remainder of the child's public education career." Thus, the School District's actions amounted to an attempt to "dump" this difficult-to-serve child in an institution and leave her there, in violation of the mandate to serve children with special needs in the least restrictive environment (presumptively the community).[4]
 
 
 18
 The School District has had a program for severely handicapped students since 1974, but according to the special education hearing officer's September, 1987 decision, the School District "admits that it has never taken steps to modify or upgrade the facilities for the purpose of serving Sherri or any other individual student," and until the School for the Blind attempted to discharge Sherri, "[did] nothing to attempt to bring Sherri home." The special education hearing officer considered the necessary changes to the School District's day program to be minimal (obtaining the services of a vocational teacher and certain facilities required to teach laundry sorting, feeding skills, and other activities of daily living). The School District's expert witness, a special education teacher who developed and drafted the individualized educational plan ["IEP"] adopted by the School District's ARD, conceded that the School District could educate Sherri in its day program with some minor alterations thereto. However, the special education teacher expressed "concern ... that the degree of consistency necessary to guarantee success could not be provided in the living environment provided by Sherri's guardian [her grandmother]."
 
 
 19
 Despite the concern that Sherri's grandmother might be incapable of providing all the supportive services required by Sherri, the special education hearing officer decided that Sherri should be placed in one of the School District's day-school programs, which she would attend while living with her grandmother or in some other community-based residence designated by her grandmother. The person with whom Sherri would reside was to receive special counselling on how best to care for Sherri. The School District was directed to convene an ARD to develop for Sherri a program of education and related services to be delivered in a community setting. Any services the ARD considered unavailable in the School District were to be specifically described in a statement to the Superintendent and Board of Trustees of the School District, who with "prudence and due haste" were to "take all steps necessary to insure that all the resources and facilities identified by the ARD as required for the discharge of Petitioner's IEP are on hand and operational when [Sherri's] placement at [the School District] is effected." The School for the Blind was directed to assist the School District in developing community-based educational and related services for Sherri. In no event was Sherri to be moved from the School for the Blind to a community placement later than January 1, 1988.
 
 
 20
 Despite rendering an opinion that Sherri should not continue to be served at the School for the Blind, and despite finding that the eligibility criteria claims were not properly before him, the special education hearing officer noted that if the School for the Blind were determined to be the least restrictive possible placement for Sherri, the School for the Blind could not lawfully deny Sherri a placement there. In other words, it was the special education hearing officer's opinion that the School for the Blind could not erect a barrier to Sherri's placement there merely by altering its eligibility criteria.
 
 
 21
 The dispute regarding Sherri's educational placement[5] and the lawfulness of the School for the Blind's eligibility criteria continued. Nell D. filed suit against TEA, the School for the Blind, the Commissioner of Education of the TEA, and several other parties in United States District Court.[6] The case was referred to a United States magistrate judge ["magistrate judge" or "district court"] for decision, pursuant to 28 U.S.C. § 636(c). A request for certification of a class action was filed, and was denied by the magistrate judge. The United States magistrate judge held hearings but encouraged settlement of the case. Despite the special education hearing officer's decision that Sherri should be moved to a community residence and mainstreamed into the local public schools to the fullest extent possible, Sherri remained at the School for the Blind.
 
 
 22
 On February 5, 1991, the magistrate judge issued the order [February Order"] on which this appeal is based. The February Order provided that Sherri was to be moved from the School for the Blind to a community residence and was to receive educational services from the School District. The February Order was at once decisive and irresolute, due to the combination of an explicit requirement that Sherri be transferred to a community residence no later than January 1, 1992 (at age nineteen), with a proviso that she be moved when services appropriate to her needs are made available in a community setting, and in no event later than her twenty-second birthday (September 20, 1994).
 
 
 23
 Without explanation, the magistrate judge stated that he would not enter final judgment until after Sherri's transfer had been accomplished. It is not clear whether the magistrate judge viewed the other disputed issues (chief among them, the lawfulness of the School for the Blind's eligibility criteria) as entirely settled when he issued the February Order.[7] In a rather confusing paragraph, the magistrate judge concluded that because there had been no less restrictive placements available in the past, the School for the Blind had constituted the most appropriate placement for Sherri. However, it was the lack of less restrictive placements that the magistrate judge appeared bent upon remedying.
 
 
 24
 On January 13, 1992, the magistrate judge denied the plaintiff's motion for a stay of the February Order. The magistrate judge made it clear that he was not wed to any particular placement option; merely that he believed Sherri should live in a community setting. The court noted that as plaintiff was appealing the propriety of Sherri's educational services, nothing should prevent the parties from finding Sherri alternative housing.[8]
 
 
 25
 Following the parties' failure to arrange for Sherri's transfer by January 1, 1992, the magistrate judge entered an order on January 15, 1992, appointing a guardian ad litem for Sherri, despite the fact that Sherri already had a legally appointed guardian (her grandmother).[9] On the same date, the magistrate judge also issued an order requiring the parties to mediate so that a timely settlement might be reached. He again noted that one of his chief concerns was that upon her twenty-second birthday, Sherri might lose her entitlement to public education and related supports before facing the difficult transition to community housing:
 
 
 26
 The Court finds that it is of the utmost importance to Sherri that she be transitioned to a permanent placement as soon as possible so that she may receive full educational benefits in her new home to optimize her chance for success at independent living. Because Sherri's legal guardian is of an advanced age ... and is not a reasonable long-term housing placement option, the Court finds that it is in the best interest of Sherri A.D. to be transitioned to a permanent housing placement long before her educational benefits expire. The Court has provided the parties with almost one full year to locate permanent housing for Sherri, to no avail.
 
 
 27
 Plaintiff appealed the February Order to this court, contending that it violates the "stay-put provision" of EAHCA, 20 U.S.C. § 1415(e)(3). Plaintiff has requested in addition that we take jurisdiction over matters outside the scope of that order but equally entwined with the merits.
 
 II. JURISDICTION
 
 28
 Ever since the Judiciary Act of 1789, there has been a federal policy that an appeal may be taken only from a final decision. Cobbledick v. United States, 309 U.S. 323, 326, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940). Generally, a district court's decision is final only when it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) (citation omitted). See also Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 275, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988). The purpose behind this rule is to avoid piecemeal appeals, which in turn conserves "judicial energy" and may help to eliminate delay. Catlin, 324 U.S. at 233-34, 65 S.Ct. at 633-34. The rule also "avoid[s] the obstruction of just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment." Cobbledick, 309 U.S. at 325, 60 S.Ct. at 541.
 
 
 29
 Although plaintiff asserts that the magistrate judge has nothing further to do but to enter judgment, defendants characterize the magistrate judge's order as preliminary,[10] and note that many issues relating to the merits remain undecided. None of the parties refer to the February Order as anything other than an interlocutory order. Because we do not regard the magistrate judge's delay in entering a final judgment to be a mere formality, but an important limit to appellate jurisdiction under 28 U.S.C. § 1291,[11] we cannot treat the order from which plaintiff appeals "as if" it were a final judgment.
 
 
 30
 Because no final judgment has been entered by the magistrate judge, we can reach the merits of plaintiff's appeal only if it can be fit squarely into one of the exceptions--judicial or statutory--to the final judgment rule. We will consider the following exceptions: collateral orders, certified questions, and interlocutory orders affecting the availability of injunctive relief and presenting a threat of serious or irreparable consequences.[12]
 
 
 31
 We do not have jurisdiction over the appeal of the February Order under the collateral orders exception to the final judgment rule. The February Order does not "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whose case is adjudicated." Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). See also Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981); Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).[13] To the contrary, the substance of the February Order is inextricably enmeshed in the merits (i.e., Sherri's placement). Thus, we do not obtain jurisdiction over it based on the collateral orders exception to the final judgment rule.
 
 
 32
 The magistrate judge has not certified that the February Order involves a "controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b). There is, however, another statutory exception to the final judgment rule which is designed to permit appeals to circuit courts from interlocutory orders of the district courts "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where direct review may be had in the Supreme Court ..." 28 U.S.C. § 1292(a)(1). Whether the injunction is preliminary or permanent is immaterial for purposes of determining appellate jurisdiction under § 1292(a)(1). Equal Employment Opportunity Commission v. Kerrville Bus Co., Inc., 925 F.2d 129 (5th Cir.1991).
 
 
 33
 Plaintiff sought a preliminary injunction and a temporary restraining order in 1987, in an effort to prevent any change in Sherri's educational program and placement, i.e., "to maintain the status quo." The temporary restraining order was denied, but a district judge postponed consideration of the motion for a preliminary injunction. Although the February Order might be interpreted as permitting Sherri's continued placement at the School for the Blind until an appropriate alternative placement can be found for her, the order clearly mandates that she be transferred to "permanent" housing. The plain import of the order is that Sherri is to be moved not only at some point, but soon. Thus, the order has the practical effect of denying an injunction against moving Sherri from the School for the Blind, even if it does not in explicit terms deny the injunction against "changes in the status quo" that was requested by plaintiff earlier in the litigation.
 
 
 34
 Orders which explicitly grant or deny injunctive relief are immediately appealable as of right; no additional finding of a threat of immediate, irreparable injury is required. See Kerrville Bus Co., 925 F.2d at 132-33; see also Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A., 875 F.2d 1174, 1176 (5th Cir.1989). The February Order does not explicitly grant or deny any injunction, although its effect is the same.
 
 
 35
 Those orders which, like the February Order, have the practical effect of denying an injunction, but do not do so in explicit terms, are immediately appealable if the order threatens "serious, perhaps irreparable consequences" and can be effectively challenged only by immediate appeal. Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981).[14] See also Kerrville Bus Co., 925 F.2d at 132-33. The showing of a threat of immediate and irreparable harm that is required in cases like Carson prior to the appellate court's review of the order is a safeguard against undue widening of the floodgates which currently keep in proper bounds the § 1292(a)(1) exception to the final judgment rule. If an order explicitly grants or denies an injunction, the same concern that animates Carson (the concern not to expand exceptions to the final judgment rule too far) does not apply. An explicit grant, denial or modification of an injunction is simple to recognize and cannot be conjured up by sophistic counsel where it does not in fact exist. Thus, if an interlocutory order explicitly affects the availability of injunctive relief, it is immediately appealable regardless of whether irreparable injury is threatened by the order.
 
 
 36
 Because the February Order does not explicitly deny an injunction, we must also find, under Carson, that the February Order not only had the practical effect of denying an injunction against Sherri's transfer but also presents a threat of serious, perhaps irreparable consequences which may be effectively addressed only by an immediate appeal.[15] We think it does. By the terms of the order, Sherri is to be moved prior to entry of final judgment. Thus, if injury results, it will result prior to the time at which appeal of a final judgment is possible. If Sherri is moved to a community residence before services appropriate to her needs and to which she is entitled under EAHCA are available, her cognitive and social skills may deteriorate, or her educational progress might be unduly delayed, meaning she would not obtain the requisite benefit from public education. See Rowley, 458 U.S. at 189-92, 200-03, 102 S.Ct. at 3042-44, 3047-49 (defining "free appropriate education" under EAHCA as individualized instruction and supportive services which confer "some educational benefit" upon the disabled child). Moreover, such a move would entail emotional upheaval for Sherri, accustomed as she is to a particular environment, a particular routine, and caretakers who (for the most part) will not follow her to her new placement. Sherri has very limited capacity to comprehend why she is being moved.[16]
 
 
 37
 The preliminary injunction hearing was postponed repeatedly and apparently was never held. However, whether the magistrate judge had earlier denied plaintiff's specific request for a preliminary injunction against moving Sherri, or effectively did so with his February 5, 1991 Order, we have jurisdiction under § 1292(a)(1).
 
 
 38
 Our inquiry into the matter of jurisdiction is not ended, however, for we must also analyze its scope. Specifically, we must decide whether to uphold plaintiff's contention that we have and should exercise appellate jurisdiction over the denial of class certification, the finding that the parties were in contempt of the February Order, the appointment of a guardian ad litem, and the claim that the School for the Blind's eligibility criteria are unlawful.
 
 
 39
 We decline to reach these other claims. Unlike the February Order, none of these other issues can be construed as granting, modifying or denying an injunction.[17] Moreover, none represents a threat of irreparable harm if not addressed by us at this juncture. See, e.g., Northwestern Nat'l Insurance Co. of Milwaukee v. Alberts, 937 F.2d 77, 82 (2d Cir.1991) (threat of irreparable harm due to an interlocutory order does not exist where party can be made whole upon resolution of case on merits). Finally, none of these matters fits into the collateral orders exception to the final judgment rule.[18]
 
 
 40
 Our inability to address the appeals of the denial of class certification and the preliminary finding as to the eligibility criteria merits further discussion. The challenge to the eligibility criteria, on grounds that they are discriminatory or otherwise unlawful, is the crucial claim plaintiff seeks to make on behalf of the proposed class.
 
 
 41
 The order denying class certification in this case does not have any irreparable effect,[19] can be reviewed either by the magistrate judge prior to entry of final judgment or by an appellate court thereafter, does not affect the merits of Sherri's individual claim (i.e., her placement),[20] and does not itself resolve the legal status of plaintiff's claims for injunctive relief (i.e., that the eligibility criteria not be applied and that Sherri not be moved from the School for the Blind). Thus, the order denying class certification is unreviewable by us on interlocutory appeal. See Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 480-81, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978) (plaintiff who brought gender discrimination action on behalf of self and other women was unable to make interlocutory appeal of denial of class certification even where "the practical effect of denial of class certification is ... to refuse a substantial portion of the injunctive relief requested in the complaint"); see also Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (decertification of class action not appealable as a matter of right, whether as a collateral order or under any other exception to final judgment rule).
 
 
 42
 We do not have jurisdiction to consider the challenge to the eligibility criteria, for the same reasons we do not have jurisdiction over the denial of class certification. In addition, if the merits are construed as going to the question of Sherri's placement, then while the eligibility criteria might be separable from the merits (in that Sherri's placement can be resolved without considering the eligibility criteria), no conclusive judgment on the criteria has been reached, and hence we do not obtain jurisdiction over the matter under the collateral orders exception to the final judgment rule.
 
 III. THE FEBRUARY 5, 1991 PLACEMENT ORDER
 
 43
 A. Power of the Magistrate to Issue the Order
 
 
 44
 The "stay-put" provision of EAHCA, 20 U.S.C. § 1415(e)(3), does not tie the hands of the courts.[21] In Honig v. Doe, the Supreme Court explained that § 1415(e)(3) was designed as a remedy against "the unilateral exclusion of disabled children by schools, not courts.... The stay-put provision in no way purports to limit or preempt the authority conferred on courts by § 1415(e)(2) ...; indeed, it says nothing whatever about judicial power." 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988) (emphasis in original; citation omitted). See also Burlington School Comm. v. Massachusetts Dep't of Educ., 471 U.S. 359, 373, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985) (the stay-put provision's purposes include "prevent[ing] school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings"); Andersen by Andersen v. District of Columbia, 877 F.2d 1018 (D.C.Cir.1989) (rejecting claim that the stay-put provision ties the hands of courts and schools alike until all administrative or judicial review is completed, and noting that "once a district court has rendered its decision approving change in placement, that change is no longer the consequence of a unilateral decision by school authorities ... once a district court has resolved the issue of appropriate placement, the child is entitled to an injunction only outside the stay-put provision, i.e., by establishing the usual grounds for such relief").
 
 
 45
 Even if the stay-put provision did apply to the district courts, however, it is not implicated here, because it is designed to prevent alteration of a child's "educational placement" during the pendency of a dispute under EAHCA, not alteration of a child's residence. In ordering Sherri transferred from the School for the Blind, the magistrate judge did not alter Sherri's individualized educational program ("IEP"); merely the location in which her IEP is to be implemented.[22] The magistrate judge specifically noted in his January 13, 1992 Order that he did not contemplate a change in Sherri's IEP, merely a change in her housing.
 
 
 46
 An educational placement, for the purposes of EAHCA, is not changed unless a fundamental change in, or elimination of, a basic element of the educational program has occurred. See, e.g., Lunceford v. District of Columbia Bd. of Educ., 745 F.2d 1577 (D.C.Cir.1984). Thus, the February Order, by directing that Sherri be moved during the pendency of the action, but that she continue to receive appropriate educational services, did not violate EAHCA and was well within the powers of the magistrate judge.
 
 B. Review of Applicable Law
 
 47
 Under EAHCA, the principle of "mainstreaming" disabled individuals with able-bodied individuals is well established. See, e.g., Board of Educ. of Hendrick Hudson Cent. School Dist., Westchester County v. Rowley, 458 U.S. 176, 202-03, 102 S.Ct. 3034, 3049 (1982). Even in cases in which mainstreaming is not a feasible alternative, there is a statutory preference for serving disabled individuals in the setting which is least restrictive of their liberty and which is near the community in which their families live. See, e.g., Burlington School Comm., 471 U.S. at 373, 105 S.Ct. at 2004; Kerkam v. Superintendent, D.C. Public Schools, 931 F.2d 84, 87 (D.C.Cir.1991). The decisions of both the special education hearing officer and the magistrate judge appear to have been based upon this understanding of EAHCA and relevant Texas regulations.
 
 
 48
 While the School for the Blind might be capable of providing services from which Sherri may obtain "educational benefit" (the standard for "appropriateness" of free public education under Rowley ), the School for the Blind is not the least restrictive environment in which Sherri may receive appropriate educational services. The capacity of the School for the Blind to provide educational services to Sherri may in some respects far exceed what EAHCA requires. However, EAHCA does not mandate that every child with a disability receive optimal services. Lunceford, 745 F.2d at 1583 ("The EAHCA does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each child"); Rowley, 458 U.S. at 198201, 102 S.Ct. at 3046-3048; Knight v. District of Columbia, 877 F.2d 1025, 1028-30 (D.C.Cir.1989); Kerkam, 931 F.2d at 87. Instead, EAHCA requires that "appropriate" educational services be delivered in the least restrictive environment available, with a preference for mainstreaming when possible.[23] The concern for enhancing the disabled child's ability to obtain educational benefit must be balanced with concerns about limited public resources, the need to provide basic educational opportunities to disabled and able-bodied children alike, and the concern to serve the disabled child in the environment which is least restrictive of the child's liberty.
 
 
 49
 In directing Sherri's transfer to a community residence, and requiring appropriate educational programming to be delivered to Sherri by her home school district, the February Order tracks the purposes of EAHCA: to provide a free, appropriate education in the least restrictive environment. Read in light of the applicable law, the February Order would mandate transfer of Sherri A.D. from the School for the Blind to a community placement not immediately, but as soon as housing can be located and appropriate educational services developed in the local public school system. The requirement that Sherri be moved no later than January 1, 1992 was a reasonable limit on the amount of time it should take to obtain such housing and educational services for Sherri.[24] All that was required of the local public school system was to obtain the services of a vocational education teacher and to acquire simple facilities for training Sherri in self-care and simple tasks that might one day be useful to Sherri in supported employment (e.g., folding laundry).
 
 C. Review of Factual Support for the Order
 
 50
 Having concluded that the magistrate judge applied the relevant law, all that stands between us and affirmance is to ascertain whether the magistrate judge's application of the law to the facts of this case was "clearly erroneous."[25] Reviewing the record before us on appeal, we cannot say that the record contains insufficient support for the magistrate judge's factual findings.
 
 
 51
 There is evidence that Sherri can be appropriately served in the community. A special education hearing officer and an expert from Sherri's School District agree that Sherri can obtain educational services in the School District from which she will be able to obtain educational benefit. The fact that her ability to obtain benefit from community-based services cannot be known for certain until Sherri has been given the opportunity is no argument against giving her that opportunity.
 
 
 52
 Sherri is twenty now. When she turns twenty-two, her eligibility for education and residence at the School for the Blind will terminate. The parties do not contemplate that she would require institutionalization at some other facility thereafter. All parties concede, and the special education hearing officer specifically found, that if Sherri were to remain at the School for the Blind, her progress over the course of the next two years would not be significant. As plaintiff herself points out, Sherri has only made a few months' worth of progress in cognitive age since she entered the School for the Blind fourteen years ago. If she would be able to work in a sheltered workshop and live in a community residence after receiving two more years of free, appropriate education under her IEP at the School for the Blind, as plaintiff claims, surely she will be able to do the same with the education she will receive under the same IEP implemented in her local school district. Plaintiff agrees that Sherri can and should eventually live in the community. It would seem that the time is now.
 
 
 53
 The magistrate judge's frustration with the parties' delay in formulating and implementing a transition plan for Sherri is evident in many of the orders subsequent to February 1991. We share that frustration. The magistrate judge did not designate any particular placement for Sherri, but directed the parties to find appropriate housing and arrange for appropriate educational services in a community setting. In allowing the parties some flexibility to develop a transition plan, the magistrate judge did not intend to provide the parties with unlimited time in which to effect that plan.
 
 IV. CONCLUSION
 
 54
 Having concluded that the magistrate judge had the power to order Sherri transferred to a community residence pending resolution of the litigation, that he correctly applied the relevant law and that his fact-finding on that issue was not clearly erroneous, we affirm the February Order. On remand, the magistrate judge should use all means at his disposal to effect the immediate location or creation of community-based housing and services appropriate to Sherri's needs, to which Sherri shall be transferred. It may be appropriate on remand for additional testimony to be received to resolve certain issues either disputed or ambiguous.[26]
 
 
 55
 AFFIRMED IN PART AND REMANDED IN PART.
 
 
 
 [1]
 This court stayed the February Order and the contempt proceedings pending the outcome of this appeal
 
 
 [2]
 Her statutory entitlement to free appropriate public education will terminate when she attains age twenty-two. See 20 U.S.C. § 1412(2)(B)
 
 
 [3]
 20 U.S.C. § 1400 et seq., now retitled the Individuals with Disabilities Education Act
 
 
 [4]
 The hearing officer reviewed the EAHCA and relevant Texas regulations governing residential placements of public school children and concluded that the laws evinced a preference for placements in the community, and in case of institutional placements, a "continuing effort ... to return the child to his or her home." The hearing officer noted that "the applicable law does not envision residential placements in any institution, public or private, as a permanent solution to the child's educational needs. [E]xcept in the most extreme circumstances, the residential placement is properly viewed as a temporary solution in order to buy time for the resident district to gear up to serve the child locally." We believe the special education hearing officer correctly assessed the law. Compare 19 Tex.Admin.Code § 89.227(g)(1)(B)(iii) ("A residential application will not be approved if the application indicates ... [t]he district does not have a plan with time lines and criteria for returning the student to the local school program") with 20 U.S.C. § 1401(18) ("The term "free appropriate public education" means special education and related services that ... meet the standards of the State educational agency"), and 20 U.S.C. § 1412(5)(B) (requiring participating states to put in place "procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids cannot be achieved satisfactorily"). See also David D. v. Dartmouth School Committee, 775 F.2d 411, 417-19 (1st Cir.1985), cert. denied, Massachusetts Dep't of Education v. David D., 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986) (finding that the "federal right to a free appropriate public education incorporates substantive rights authorized by state special education law which become part of the federal core right"); Rowley, 458 U.S. at 202-03, 102 S.Ct. at 3049 (noting that the "mainstreaming preference" of the EAHCA means that the Act "requires participating States to educate handicapped children with nonhandicapped children whenever possible")
 
 
 [5]
 It appears that plaintiffs interpret "educational placement" under EAHCA to include, for persons with disabilities as severe as Sherri's, only residential educational services. Defendants, on the other hand, regard housing and education as separable in Sherri's case, much as they are for able-bodied school-age children. Thus, defendants believe that Sherri's "educational placement" is a program of services that can be delivered in any one of a variety of settings, some more restrictive than others
 An "educational placement" under EAHCA is not a place, but a program of services from which the child can obtain some educational benefit; not necessarily the perfect education. See Lunceford v. District of Columbia Bd. of Educ., 745 F.2d 1577 (D.C.Cir.1984) (change in feeding schedule that would occur with transfer of severely handicapped young adult from private hospital to public institution insufficient to constitute "change in educational placement"; although the court refused to find that a change in residence for a profoundly handicapped child can never be a change in educational placement, it noted that any such change would have to result in a "fundamental change in, or elimination of a basic element of the educational program" before it constituted a change of educational placement); Knight v. District of Columbia, 877 F.2d 1025, 1029 (D.C.Cir.1989) (a school district discharges its duty under EAHCA to deliver an appropriate education "if it merely places the student in a program "sufficient to confer some educational benefit," " quoting Rowley, 458 U.S. at 200, 102 S.Ct. at 3047 (emphasis added)).
 
 
 [6]
 EAHCA allows "[a]ny party aggrieved by the findings and decision" of the special education hearing officer to file suit in state or federal court. 20 U.S.C. § 1415(e)(2). Plaintiff also brought claims under the Fourteenth Amendment, the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g, the Civil Rights Act, 42 U.S.C. § 1983, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794
 
 
 [7]
 In the text of the February Order, the magistrate judge made a preliminary finding that the School for the Blind's eligibility criteria were lawful. He had previously denied class certification
 
 
 [8]
 The magistrate implicitly referred to the fact that an "educational placement" under EAHCA is not a place, but rather a program of services, which may be delivered in various settings: "The change envisioned by the Court is not a change in the plaintiff's educational placement; it is a change in the plaintiff's housing. Both [the School for the Blind] and [the School District] have indicated willingness to assist the plaintiff in "educational" matters during the housing transition of the plaintiff."
 
 
 [9]
 The magistrate judge explained that, "The Court wishes to insure that the best interests of the child are preserved among the various interests presented to the Court in this lawsuit"; implying that he considered none of the parties to be sufficiently disinterested or independent to make Sherri's best interests their paramount concern. Apparently, the magistrate did not hold any hearing or provide any findings of fact to support his appointment of the guardian ad litem
 
 
 [10]
 Defendant Texas Education Agency ("TEA") explains that the delay in entry of judgment and the ambiguousness of the February Order is due to the "preliminary" nature of the order. In characterizing the order as "preliminary," and in denying that the order poses any threat of irreparable injury, TEA hopes to discourage this court from exercising jurisdiction over plaintiff's appeal. In support of its argument, TEA refers to the magistrate judge's requirement of periodic reports and a transition plan which would "include a date of transfer, place of housing, provider of educational component, all necessary and required statutory and regulatory approvals, and the signature of all parties." TEA also notes that the magistrate judge began the February Order with a requirement that the parties show cause why the court should not add two parties; moreover, the magistrate judge's June 27, 1991 order suggests that he did not view his February Order as final and determinative: "[i]n the court's opinion, the appeals filed are untimely, no final appealable order or judgment having been entered." The magistrate specifically described as "preliminary" only one element of his February Order--the portion of the order pertaining to the challenge to the eligibility criteria of the School for the Blind. Because we find that the February Order amounts to a denial of an injunction and poses a real, if not certain, threat of irreparable injury (either by causing Sherri's transfer to a setting in which she cannot be served or in which services are currently unavailable), the conflicting characterizations of the order (as preliminary or as nearly final) are of virtually no moment in our consideration of the matter of Sherri's placement. They do, however, carry limited weight in our consideration of appellate jurisdiction over other issues such as the challenge to the eligibility criteria of the School for the Blind
 
 
 [11]
 28 U.S.C. § 1291 provides: "The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States ... except where a direct review may be had in the Supreme Court." See also McLish v. Roff, 141 U.S. 661, 12 S.Ct. 118, 35 L.Ed. 893 (1891) (recognizing need for final judgment rule prior to enactment of statutory basis for same)
 
 
 [12]
 We note that jurisdiction cannot be predicated upon the purported "practical finality exception," for it is more chimerical than real. In Gillespie v. United States Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), the Supreme Court did not develop a formal exception to the final judgment rule; instead, it "applied a practical test in deciding whether the practical finality requirement was satisfied" on the facts of the particular case before it. Robert M. v. Benton, 622 F.2d 370, 372 n. 2 (8th Cir.1980). See also Coopers & Lybrand v. Livesay, 437 U.S. 463, 477 n. 30, 98 S.Ct. 2454, 2462 n. 30, 57 L.Ed.2d 351 (1978)
 
 
 [13]
 The three-pronged test for collateral orders appealable prior to final judgment that was identified in Coopers & Lybrand v. Livesay, and repeated in Firestone Tire and Rubber v. Risjord, is virtually a restatement of the test enunciated in Cohen. See Firestone Tire and Rubber Co. v. Risjord, 449 U.S. 368, 375, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)) (order "must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment")
 
 
 [14]
 Carson's additional requirement that appellant show an immediate threat of irreparable injury or serious consequences only applies to orders which do not explicitly grant, deny or modify an injunction but which nevertheless have a practical effect on the availability of injunctive relief. Orders which explicitly grant, deny or modify an injunction remain appealable "as of right, right away." Kerrville Bus Co., Inc., 925 F.2d at 132 (citing Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A., 875 F.2d 1174, 1176 (5th Cir.1989), cert. denied, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990))
 Plaintiff argues that in order to review the February Order, we need not find a threat of irreparable injury, if we find that the February Order effectively grants or denies an injunction "affect[ing] predominantly all of the merits of the case" (emphasis added). Although several other circuits appear to accept that argument, see, e.g., I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Industries, Inc., 789 F.2d 21, 24 n. 3 (D.C.Cir.1986), cert. denied, 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986); Center for Nat'l Security Studies v. CIA, 711 F.2d 409, 412-13 (D.C.Cir.1983) (collecting cases); see also Tokarcik v. Forest Hills School Dist., 665 F.2d 443, 447 (3d Cir.1981), cert. denied, Scanlon v. Tokarcik, 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982), it does not appear to be the rule in this circuit. See Kerrville Bus Co., 925 F.2d at 132. In any case, because we find that the February Order does present a threat of irreparable injury to plaintiff, we need not reach this question. Still, we note that the February Order does not affect "predominantly all the merits," because while it addresses the question of Sherri's placement, it makes only a preliminary finding as to plaintiff's challenge to the School for the Blind's eligibility criteria, and leaves yet other claims made by plaintiff wholly unaddressed.
 
 
 [15]
 Neither delay nor increased cost of litigation alone will suffice to show irreparable harm. Irreparable harm is "greater than the harm suffered by any litigant forced to wait until the termination of the [proceedings] before challenging interlocutory orders it considers erroneous." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 378-79 n. 13, 101 S.Ct. 669, 675-76 n. 13, 66 L.Ed.2d 571 (1981). See also I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Industries, Inc., 789 F.2d 21, 24-25 (D.C.Cir.1986), cert. denied, 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986)
 
 
 [16]
 The mere fact that Sherri may suffer emotional upheaval due to being transferred does not mean the move to a community placement would be unjustified. We only note that an improper move might constitute irreparable injury
 
 
 [17]
 An order which "merely limits the scope of the relief that may ultimately be granted.... [w]hile it may have a significant effect on the litigation ... is not for that reason converted into [an injunction]." Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 481, 98 S.Ct. 2451, 2454, 57 L.Ed.2d 364 (1978) (quoting Morgantown v. Royal Insurance Co., 337 U.S. 254, 258, 69 S.Ct. 1067, 1069, 93 L.Ed. 1347 (1949))
 
 
 [18]
 To come within the exception to the final judgment rule for certain "final collateral orders," the order "must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." Firestone Tire and Rubber Co. v. Risjord, 449 U.S. 368, 375, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)). The magistrate judge's preliminary finding that the eligibility criteria are lawful, even if separable from the merits, is by definition not conclusive. The contempt proceedings, the denial of class certification and the appointment of a guardian ad litem should be reviewable on appeal from a final judgment
 
 
 [19]
 Plaintiffs argue that the approach of Sherri's twenty-second birthday makes denial of class certification a potential death knell to the claims of the class. Presumably that is because Sherri's individual challenge to the School for the Blind's eligibility criteria may be, or may soon become, moot. However, if it is later determined that class certification was improperly denied, the claims of the class may continue to be pressed even if Sherri's own claims are moot. See, e.g., United States Parole Comm'n v. Geraghty, 445 U.S. 388, 404, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980) (despite fact that class action was never certified and named plaintiff's own claims were rendered moot pending appeal, the questions of class certification and class claims could still be appealed)
 
 
 [20]
 While the claim that the eligibility criteria are discriminatory is the central claim brought by the class, the question of the lawfulness of the School for the Blind's eligibility criteria need not be resolved in order to determine whether the February Order regarding Sherri's placement was consistent with EAHCA. The magistrate judge did not rely on the eligibility criteria in reaching a decision regarding Sherri's placement. Rather, the magistrate judge decided what placement would be the least restrictive environment in which appropriate educational services could be delivered to Sherri. We need not consider the challenge to the eligibility criteria, therefore, in order to resolve the question of Sherri's individual placement
 
 
 [21]
 20 U.S.C. § 1415(e)(3) provides:
 During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child ... until all such proceedings have been completed.
 
 
 [22]
 There is precious little evidence in the record to support the argument that Sherri's educational program would necessarily have to be altered merely because of a change in the location in which it is provided to her. The mere fact that one location may be able to provide better services, or services beyond those required by the IEP, does not mean that delivery of educational services at another location would be inappropriate
 
 
 [23]
 See 20 U.S.C. § 1412(5). In fact, the notion of mainstreaming is helpful in defining what placements are least restrictive of the disabled child's liberty, because it encourages the delivery of educational services to both disabled and able-bodied children in the same environment when feasible. The notion of the least restrictive environment involves not only freedom from physical restraint, but the freedom of the child to associate with his or her family and with able-bodied peers
 
 
 [24]
 The February 5, 1991 Order allowed the parties nearly one full year in which to arrange for educational services and housing for Sherri in the community
 
 
 [25]
 In cases referred by a district judge to a magistrate for decision with consent of the parties under 28 U.S.C. § 636(c), the standard of review of findings of fact is the same standard applied to district judges. In Archambault v. United Computing Systems, 695 F.2d 551, 551 (11th Cir.1983), the court noted that where a magistrate serves as special master with consent of the parties under 28 U.S.C. § 636(b)(2), "[t]he findings of the special master are entitled to the same deference as those of the typical factfinder." In the case before us, the parties consented to trial and decision by a magistrate, under § 636(c), making the factfinder even more like a district judge than the special master in Archambault. See also Proctor v. North Carolina, 830 F.2d 514, 517 (4th Cir.1987) (review of magistrate judge's fact-finding is governed by "clearly erroneous" standard); see generally 1 Steven A. Childress and Martha S. Davis Standards of Review 33-34 (1986) (discussing standards of review applicable to findings of magistrates acting in different capacities and concluding that "whether a magistrate receives clear error deference or a de novo determination hinges on the basis of the referral and, more generally ... on "the extent to which the magistrate approaches the exercise of ultimate judicial authority." " [citation omitted]
 
 
 [26]
 Additionally, on remand, the magistrate judge should make written findings supporting his appointment of a guardian ad litem. Certain allegations contained in the report of the guardian ad litem, if true, would tend to support the magistrate judge's decision, and raise ethical concerns regarding the ability of plaintiff's counsel to advocate simultaneously the interests of Sherri and the class for which counsel seeks certification. The allegations also raise questions about whether the requisite commonality for maintenance of a class action exists as between Sherri and the rest of the class for which plaintiffs seek certification. Specifically, the alleged interference by plaintiff's counsel with Sherri's guardian's acceptance of a settlement offer with which the guardian ad litem was also in agreement, is particularly disturbing where acceptance might foreclose the class action but be in the best interests of the named plaintiff and consistent with the wishes of her guardian