Stephen Andrew **KNIGHT, by his Parent and next friend, Nettie KNIGHT, et al.**

v.

**DISTRICT OF COLUMBIA, a Municipal Corporation, et al., Appellants.**

No. 88–7223.

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1989.

Decided June 23, 1989.

Susan S. McDonald, with whom Frederick D. Cooke, Jr. and Charles L. Reischel, Washington, D.C., were on the brief, for appellants.

Michael J. Eig, with whom Matthew B. Bogin, Washington, D.C., and Margaret A. Kohn were on the brief, for appellees.

Before WILLIAMS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The District of Columbia appeals from a district court order, 691 F.Supp. 1567, entered pursuant to the Education for All Handicapped Children Act, 20 U.S.C. § 1401, *et seq.*, requiring it to reimburse plaintiff, Mrs. Nettie Knight, for the tuition she paid for her son Andy to attend The Lab School of Washington during the 1987–88 school year. The district court reversed an administrative hearing examiner's order that had denied Mrs. Knight's request for tuition reimbursement. We reverse the judgment of the district court.

## I. BACKGROUND

In October 1984, at age ten, Andy was in an automobile accident that left him with severe emotional, physical, and intellectual disabilities. Both before and since the accident, he has also suffered from what the parties call a "gender identity disorder"; that is, he entertains some doubts about whether he "should" be a boy. Despite these problems, his IQ is 119, which puts him at the border between the "high average" and the "superior" ranges of measured intelligence.

When he was discharged from the Children's Rehabilitation Center at the University of Virginia Medical Center after the accident, District of Columbia Public Schools (DCPS) records reflect, "Andy was recommended for placement in a 5–day residential setting with the necessary supportive services and [learning disabled] curriculum." Accordingly, in July 1985, Andy was enrolled, with DCPS' approval and at DCPS' expense, in the residential program at the Episcopal Center for Children.

In November 1986, Episcopal informed DCPS that Andy would be ready for a new placement in the fall of 1987, and suggested that "[a] center for learning disabilities such as presented by the Lab School of Washington, D.C. might be the most appropriate placement...." Accordingly, in March 1987, DCPS held a meeting with Mrs. Knight and two representatives of Episcopal to develop an Individualized Edu-

cation Program (IEP) for Andy for the following year. In April, DCPS notified Mrs. Knight that, for the 1987–88 school year, it proposed to implement Andy's IEP at the Buchanan Learning Center, a D.C. public school.

Mrs. Knight objected to Andy's being placed at Buchanan. At an adversarial administrative hearing held in July 1987, DCPS presented a number of witnesses, ｅ ch of whom testified that Buchanan ｖ ｏuld be an appropriate placement for Andy. Mrs. Knight and Dr. Sidney Manning, a psychologist, testified to the contrary. Mrs. Knight testified that she objected to the proposed placement: (1) because Andy's gender identity disorder requires that there be a more nearly equal mixture of boys and girls than Buchanan could provide; and (2) because Buchanan's location distant from the Knights' home meant that, as a single parent, she would be unable both to work and to get Andy to all of his appointments with doctors and therapists, while she could do both if he were enrolled at The Lab School. Dr. Manning testified to the importance of Andy's being in an environment where the male/female ratio was as close to equal as possible, and added that "an ideal peer group" for Andy would have IQs similar to his. Dr. Manning concluded that The Lab School was appropriate for Andy. The hearing officer issued her decision in August 1987, finding that Buchanan was an appropriate placement for Andy.

Mrs. Knight nevertheless enrolled Andy at The Lab School, and in September, initiated an action in the district court, requesting a preliminary injunction requiring the District to pay The Lab School tuition while the case was pending. She also sought a declaration that The Lab School was, and that Buchanan was not, an appropriate placement for Andy. The district court heard the case in June 1988. Because the 1987–88 school year had already passed, the court treated the case on the merits, rather than on the request for a preliminary injunction. At the hearing, a representative of The Lab School testified about its programs and offered her opinion that "it would be best for [Andy] to be in a group of children who were of similar or above, superior intelligence to challenge him and push him along."

The district court filed its decision in August 1988, concluding that (1) DCPS had violated the "stay-put" provision of the Act, 20 U.S.C. § 1415(e)(3), about which more below; (2) although The Lab School was an appropriate placement for Andy during the 1987–88 school year, Buchanan was not, because its "gender mix, intellectual mix, and student-teacher-therapist ratio" were insufficient to meet Andy's needs, and because "there is no evidence that Andy's parents would be involved in the Buchanan program, or that any family counseling would be available there"; and (3) reimbursement of Andy's expenses at The Lab School for that year was an appropriate remedy under *Burlington School Committee v. Massachusetts Dept. of Education*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). On appeal, the District challenges each of these conclusions. Mrs. Knight does not rely upon the district court's concerns with the "student-teacher-therapist ratio" or the asserted lack of parental involvement and family counseling at Buchanan, however, and we do not address those subjects.

## II. ANALYSIS

We address the applicability and effect of the stay-put provision and of Buchanan's appropriateness in turn.

### A. *The Stay-put Provision*

■ The stay-put provision of the Act provides that

[d]uring the pendency of any proceedings conducted pursuant to this section [governing administrative and judicial review of placement decisions], unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the

public school program until all such proceedings have been completed.

20 U.S.C. § 1415(e)(3). Mrs. Knight argues that the District violated the stay-put provision in this case, emphasizing that at the end of the 1986–87 school year Andy was in a private school, and that his placement in a public school such as Buchanan would necessarily have been a change in his then current placement, triggering the protections of § 1415(e)(3). We find her interpretation of the statute unpersuasive.

This court has held that if a student's "then current educational placement" becomes unavailable, DCPS must provide him with a "similar" placement pending administrative and judicial approval of its eventual plans. *McKenzie v. Smith*, 771 F.2d 1527, 1533 & n. 3 (D.C.Cir.1985) (student's placement at private day school would not be available for following year because he had reached highest grade level there). DCPS claims that it fulfilled its duty under *Smith* by designating Buchanan as Andy's new placement. The question before us is thus whether Buchanan is in relevant respects similar to Episcopal.

The question is further narrowed because the only sense in which Mrs. Knight argues that the two schools are dissimilar is that Episcopal is a private school and Buchanan is a public school. In support of her assertion that this is a significant distinction, she notes that in *Smith* "DCPS was obligated to locate and arrange a placement in a similar program—a day program in a private special education facility." *Id.* at 1527. She also points to two district court decisions—the decision under review and that in *Banta v. District of Columbia*, 1988–89 EHLR 441:237, 240 (D.D.C. Dec. 6, 1988)—that interpret *Smith* to hold that a public school is not, as a matter of law, "similar" to a private school in the sense that placement in a public school could not satisfy the requirement of the stay-put provision where the prior, but now unavailable, placement was at a private facility.

This is not a correct interpretation of the *Smith* opinion. The student in question there had been placed in a private day school for learning disabled children. 771 F.2d at 1529. His IEP "stated that [he] was to spend no time in regular classes." *Id.* at 1530. When the private school would no longer be available, however, the District proposed to place him in a learning disabilities program in a regular D.C. public high school (Coolidge), with "at least 25% of his academic instruction in regular classes...." *Id.* The public school placement was clearly not similar to the student's prior placement because it did not implement his IEP. Furthermore, we take notice of the fact that, when the District proposed the Coolidge placement at issue in *Smith*, it had not yet built Buchanan; thus, there was no "[public] special education facility in the District.\* In this context the court's reference to the District's obligation to provide a "private special education facility" under the stay-put provision can hardly be taken to signify our holding that a public school cannot be "similar" for purposes of an interim placement when a student's prior placement is no longer available. Clearly, *Smith* is too frail a foundation upon which to support the structure of Mrs. Knight's argument.

More fundamentally, it would be plainly illogical to say that a public school is, simply because it is public, dissimilar to a private school in any way relevant to its capacity to provide an appropriate education to a learning disabled child. A particular public school may or, like Coolidge in the *Smith* case, may not be able to implement a particular student's IEP; whether it is a private or a state enterprise is utterly immaterial by itself. The plaintiffs' notion to the contrary is inconsistent, moreover, with the bias favoring public education of the handicapped pervasive in the Act. It is even belied by *Smith* itself, in which the court expressly refused to sanction the general proposition "that special

---

\* In her brief, Mrs. Knight argued that, because there is no indication in *Smith* itself or in the record here that the District at that time was without a public special education facility, we must assume it did have such a school. As a matter of public record, however, and as counsel sensibly conceded at argument, no such facility then existed.

education programs in [regular] public schools are less likely to provide appropriate educational services" in cases other than *Smith* itself. *Id.* at 1532 n. 10.

Therefore, we do not interpret either the Act or our reading of it in *Smith* to hold that a public placement is inherently dissimilar to a private placement for the purpose of satisfying the school district's obligation to provide a "similar" placement, on an interim basis, when a child's prior placement is no longer available and a new and "appropriate" placement has not yet been finally determined. Because Mrs. Knight's argument based on the stay-put provision depends entirely upon a proposition that we do not accept, her claim to relief under that section must fail.

Indeed, it is arguable that Mrs. Knight's claim might fail for a second reason: *viz.*, that the stay-put provision is not implicated in this case at all. *See Lunceford v. District of Columbia Bd. of Ed.*, 745 F.2d 1577, 1582 (D.C.Cir.1984) (parents "must identify, at a minimum, a fundamental change in, or elimination of a basic element of the educational program in order for the change to qualify as a change in educational placement" triggering the stay-put provision). Because the District, inexplicably, did not raise the possibility that *Lunceford* might be the answer to Mrs. Knight's claims, however, we leave for another day both the question whether *Lunceford* would be dispositive of a case such as this and the reconciliation of any tension that might exist between *Lunceford* and the later-decided *Smith*.

### B. *The Appropriate Program*

■ Mrs. Knight would still be entitled to reimbursement for Andy's tuition at The Lab School for the 1986–87 school year, under *Burlington School Committee*, if the District's proposed placement was not appropriate. Since DCPS discharges its duty under the Act if it merely places the student in a program "sufficient to confer some educational benefit ...," *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 3048, 73 L.Ed. 2d 690 (1982), a court cannot order the District to reimburse Mrs. Knight unless it can say that Buchanan would not have met even that modest standard. In addressing that question, moreover, the reviewing court must give the administrative determination that Buchanan is appropriate "due weight." *Id.* at 206, 102 S.Ct. at 3051. Mrs. Knight has fallen far short of meeting the burden that the Act has thus placed upon her.

We need not tarry long over this point, for Mrs. Knight has not contended that Buchanan would be unable to provide "some educational benefit" to Andy. Rather, each of her arguments is directed to the claimed superiority of The Lab School's program. For example, she does not argue that Andy needs a particular boy/girl ratio in order to realize some educational benefit, and that Buchanan does not provide it, but only that in order for Andy to cope with his gender identity disorder, the more equal the ratio the better. The mere statement of the claim shows its insufficiency as a basis upon which to overturn the hearing examiner. Thus, while there is no disputing that the ratio of boys to girls is more favorable in this regard at The Lab School than at Buchanan, and while it may well be that The Lab School would therefore be, in this regard, a superior educational environment for Andy, the Act does not permit us to make such a comparative inquiry, and Mrs. Knight has presented no evidence that would permit us to conclude that Buchanan's ratio of boys to girls is such that Andy could not progress educationally there.

Mrs. Knight also argues that the ideal situation would be for Andy's peers to have IQs similar to or higher than his. The testimony established that the ranges of IQs among the children at The Lab School (from 83 to 139) and at Buchanan (from 70 to 140) were almost identical. Within the group of students from which Andy's classmates would come, the range at Buchanan was from 82 to 118, with an average of 93 and a median of 91. No similar data were provided for The Lab School, however. Thus, there is no basis in the record for asserting that the intellectual mix of Andy's peers in the two programs would be significantly different. More important, however, there is simply no evidence to support the proposition that Andy will be unable to obtain educational benefits in Bu-

chanan's environment, and the absence of such evidence is fatal to Mrs. Knight's argument over relative IQ ranges.

Finally, Mrs. Knight argues that Buchanan's location is inconvenient. Assuming it is so inconvenient that the point is relevant, DCPS did offer to accommodate the Knights' transportation needs, in light of which we cannot conclude that Buchanan is so inaccessible as to render it inappropriate. We do not hold that a placement can never be so geographically undesirable that its location alone makes it inappropriate, but this is not even a close case in that regard.

In short, while The Lab School may well be in some respects, and overall, a better place than is Buchanan for Andy, the Act simply does not place the comparative question before the court. It is thus clear that the district court erred in overturning on comparative grounds the hearing officer's non-comparative determination that Buchanan was an appropriate placement.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is

*Reversed.*