PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 14-4044
———

D.M.;
L. M., on behalf of E.M.;
LEARNING CENTER FOR EXCEPTIONAL CHILDREN

v.

NEW JERSEY DEPARTMENT OF EDUCATION;
LINDA CHAVEZ; PEGGY MCDONALD,
                                        Appellants
———

On Appeal from United States District Court
for the District of New Jersey
(D.N.J. No. 2-14-cv-04620)
District Judge:  Honorable Esther Salas
———

Argued June 4, 2015
Before:  FISHER, JORDAN, and SHWARTZ, *Circuit
Judges*.

(Filed: September 10, 2015)

Jennifer J. McGruther, Esq.  ***ARGUED***
Office of Attorney General of New Jersey
Department of Law & Public Safety
Division of Law
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625

***Attorney for Appellants***

Vito A. Gagliardi, Jr., Esq.  ***ARGUED***
Porzio, Bromberg & Newman
100 Southgate Parkway
Morristown, NJ 07962

***Attorney for Appellees***

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

E.M. is a student at the Learning Center for Exceptional Children ("LCEC"). LCEC is a private school for children with intellectual disabilities. E.M.'s individualized education program—her federally-mandated education plan created by her parents, teachers, and local public-school system—says that she should attend LCEC and integrated classes with students from Today's Learning Center ("TLC"). TLC is a private school for regular-education students that shares classroom space with LCEC. The New Jersey Department of Education ("the Department") asserts that it

2

has not approved LCEC or TLC to teach integrated classes of regular-education students and students with disabilities. Therefore, the Department directed LCEC to confirm that it would not place its public-school students with disabilities in classrooms with private-school regular-education students. LCEC agreed under protest.

E.M.'s parents—D.M. and L.M.—on behalf of E.M. and LCEC sued the Department and two of its officials, challenging the Department's regulation of LCEC as arbitrary and capricious, and sought preliminary injunctive relief. The District Court granted E.M. a preliminary injunction under the so-called "stay-put" rule of the Individuals with Disabilities Education Act ("IDEA"). The injunction allowed her to attend classes with TLC's regular-education students during the pendency of the case. We will remand the case with the injunction intact for additional fact finding.

I.

1.

The Individuals with Disabilities Education Act imposes conditions on any State that accepts certain federal educational funding assistance. New Jersey accepts this assistance and is bound by those conditions.

Under IDEA, a State must provide a free appropriate public education to all students with intellectual disabilities. 20 U.S.C. § 1412(a)(1)(A).[1] A free appropriate public education is, among other things, an education that is provided in conformity with an individualized education program for that child. *Id.* § 1401(9)(D). A State can provide

---

[1] The United States Department of Education has issued implementing regulations for IDEA. *See* 34 C.F.R. pt. 300. However, the general statutory provisions are sufficient to provide background.

3

a free appropriate public education to a child with disabilities by paying for that child to attend a private school if the State ensures that the private school meets the same standards that the State requires of public schools and if the private school accords with the child's individualized education program. *Id.* § 1412(a)(10)(B). The New Jersey Department of Education approves private-school programs to serve these public-school students with disabilities, but the approval process is for specific programs only and is not a general certification of the school. N.J. Admin. Code § 6A:14-7.1(a).

An individualized education program—frequently abbreviated as "IEP"—must be created and in effect for each child with disabilities by the beginning of each school year. 20 U.S.C. §§ 1412(a)(4), 1414(d)(2)(A). Each year, a child's IEP is developed by a team that includes the child's parents, at least one regular-education teacher, at least one special-education teacher, a representative of the local educational agency, and the child himself or herself, if appropriate. *Id.* § 1414(d)(1)(B). If needed to interpret evaluation results or to provide other expertise, additional individuals may participate in creating the IEP. *Id.* The IEP should state the child's present levels of achievement and performance, provide annual goals, and explain how progress will be measured. *Id.* § 1414(d)(1)(A)(i). The IEP should also state "the special education and related services and supplementary aids and services . . . to be provided to the child" and "the anticipated frequency, location, and duration of those services and modifications." *Id.* § 1414(d)(1)(A)(i)(IV), (VII). Once an IEP has been created, it may only be amended by the entire IEP team or by agreement between the parents and the local educational agency. *Id.* § 1414(d)(3)(F).

IDEA also requires that States provide a dispute resolution system should a parent or public agency dispute

4

whether the child is receiving a free appropriate public education. Either party may seek mediation or present a complaint to an administrative law judge, who will then adjudicate the parties' disagreement. *Id.* § 1415(b)(6), (c)(2), (d), (e), (f). When parties go before an administrative law judge, the process is called a "due process hearing." *Id.* § 1415(f). Any party aggrieved by the ALJ's findings can administratively appeal. *Id.* § 1415(g). Any party still aggrieved after the administrative appeal may file a civil action in a state court of competent jurisdiction or in a federal district court. *Id.* § 1415(i)(2).

Importantly, IDEA requires that "during the pendency of any proceedings" the child "shall remain in the then-current educational placement" unless the parents and the state or local educational agency agree otherwise. *Id.* § 1415(j). This is commonly referred to as IDEA's "stay-put" rule.

2.

The Learning Center for Exceptional Children is a private school for students with disabilities. It opened in 1978. During the times relevant to this lawsuit, LCEC leased classroom space in a building in Clifton, New Jersey. Also sharing this space was a private school for regular-education students, Today's Learning Center. The principal of LCEC is also the principal of TLC.

LCEC has received authorization from the New Jersey Department of Education to educate public-school students with disabilities referred to LCEC by the students' local public-school systems into certain programs. LCEC received its most recent approval in 2011. In its application for this approval, LCEC listed one of the programs as "integration of disabled and non-disabled peers." App. at 25 (alteration omitted). The application, however, did not mention that

5

LCEC students would attend integrated classes with TLC's students. The Department has never approved TLC to educate any public-school students with disabilities.

E.M. is a ten-year-old girl who most recently was in the fourth grade. Her local public-school system, Hoboken, classified her as "Multiply Disabled" and eligible to receive special education services. Beginning in January 2011, she has attended LCEC, as stated in her IEPs for each year. "LCEC was specifically selected as the out-of-district educational placement for E.M. due to her unique academic and social/emotional needs." App. at 22. For the 2014-15 school year, "[E.M.'s] IEP calls for her to [be] integrated with regular education students in a small classroom at TLC with a low student-to-teacher ratio." *Id.* She is also to receive a one-on-one, in-classroom assistant and other curricular modifications.

In December 2013, after an on-site inspection, the Department requested a "statement of assurance that non-public school students from TLC are not in class with public school students from LCEC." App. at 26. The Department subsequently denied LCEC's request to locate to a different building, stating that it did so because LCEC educated its public-school students with disabilities with TLC's regular education students. The Department also changed LCEC's approval status to "conditional approval," which meant that LCEC could not enroll any new public school students. *See* N.J. Admin. Code § 6A:14-7.10(b)(1)(i). LCEC filed petitions for review of both decisions with the New Jersey Office of Administrative Law, which are still pending although a decision is expected shortly. In July 2014, LCEC assured the Department that it would not place its public-school students with disabilities in classrooms with TLC's regular-education students, despite the fact that some of its

6

students' IEPs—such as E.M.'s—called for it. LCEC remains on conditional approval status.

3.

On July 23, 2014, LCEC and E.M., through her parents D.M. and L.M., sued the Department, as well as Linda Chavez and Peggy McDonald—two senior employees in the Department. LCEC sought injunctive and declaratory relief allowing LCEC to accept new students and to educate its public-school students with TLC's regular-education students. E.M. sought injunctive and declaratory relief prohibiting the Department from acting "in a manner that precludes LCEC from implementing the mainstreaming component of E.M.'s IEP." App. at 37.[2] E.M. also sought her attorneys' fees in bringing the suit, as permitted by 20 U.S.C. § 1415(i)(3)(B).

After the District Court denied the plaintiffs' request for a temporary restraining order, the parties filed and briefed a motion for a preliminary injunction on an accelerated basis. When the briefing was complete, the District Court held a hearing. The District Court, finding that the plaintiffs' arguments had evolved, ordered supplemental briefing on the applicability of the "stay-put" rule to E.M.

After the supplemental briefing, the District Court granted a preliminary injunction to E.M. only. It held that E.M. did not need to first seek a "stay-put" order from the administrative process, that the Department was altering E.M.'s "educational placement" by preventing LCEC from educating its public-school students with disabilities with

---

[2] "Mainstreaming" refers to the process in which students with disabilities are integrated with their non-disabled peers in regular-education classrooms.

7

TLC's regular-education students, and that, therefore, E.M. was entitled to an injunction while she challenged the Department's actions. The District Court's injunction orders that the Department be "enjoined from interfering with Plaintiff LCEC's implementation of E.M.'s Individualized Education Plan" and applies "only to E.M. and no other student at LCEC." App. at 2. The Department timely appealed.[3]

## II.

The District Court had jurisdiction over this suit under 28 U.S.C. § 1331. We have jurisdiction over this appeal from the District Court's order entering a preliminary injunction under 28 U.S.C. § 1292(a)(1).

Typically, we review the District Court's preliminary injunction under a "tripartite standard": "We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (internal quotation marks omitted). However, our review of a preliminary injunction entered pursuant to IDEA's "stay-put" rule is more specific.

The "stay-put" rule "functions, in essence, as an automatic preliminary injunction." *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996). This is because, under the rule, "the child shall remain in the then-current educational placement" while "proceedings conducted

---

[3] The Department has moved to dismiss LCEC's and E.M.'s complaint. That motion is still pending before the District Court, although the District Court recently requested, and the parties have filed, supplemental briefing on the motion.

8

pursuant to [20 U.S.C. § 1415]" are ongoing. 20 U.S.C. § 1415(j). Thus, if the "stay-put" rule applies, children "are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved" "*regardless of whether their case is meritorious or not*." *Drinker*, 78 F.3d at 864 (emphasis added) (internal quotation marks omitted). The "usual prerequisites to injunctive relief" are not required. *Id.* (internal quotation marks omitted). Therefore, the Court reviews the application of the "stay-put" rule to a given set of facts de novo. *Id.* at 865.

## III.

Under 20 U.S.C. § 1415(j), "during the pendency of any proceedings conducted pursuant to [§ 1415], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." In other words, if there are "proceedings conducted pursuant to [§ 1415]" ongoing and the child will otherwise be moved from her "then-current educational placement," the child is entitled to an injunction against the change. We must, therefore, ask two questions. First, is E.M.'s suit against the Department a "proceeding[] conducted pursuant to [§ 1415]"? Second, is E.M.'s "educational placement" being altered?

### 1.

Whether E.M.'s suit against the Department—claiming that its directive to LCEC breaches its obligations under IDEA and denies her a free appropriate public education—constitutes a "proceeding[] conducted pursuant to [§ 1415]" requires us to consider two subordinate issues. First, the federal courts must have subject-matter jurisdiction over the suit. Second, E.M.'s claim must be one that can be enforced through an action under § 1415. We begin with the subject-matter jurisdiction issue.

9

IDEA authorizes an aggrieved party to file suit in a federal district court should there be a dispute as to whether a child is receiving a free appropriate public education. 20 U.S.C. § 1415(i)(2)-(3). However, a federal court may not exercise subject-matter jurisdiction over the dispute unless state administrative remedies have been exhausted. *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) ("In the normal case, exhausting the IDEA's administrative process is required in order for the statute to grant subject matter jurisdiction to the district court." (internal quotation marks and alterations omitted)). Exhaustion is not required in very limited circumstances, such as where exhaustion is futile or inadequate, where the question presented is purely legal, where the administrative process cannot grant relief, or where exhaustion would work a severe or irreparable harm upon a litigant. *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778-79 (3d Cir. 1994).

Here, we find that the administrative process would be unable to grant relief, and so exhaustion of that process is unnecessary.[4] Neither IDEA nor the New Jersey administrative code provides administrative means for a parent to challenge an action of a state agency, only to challenge action of a local public-school system. *See, e.g.*, 20 U.S.C. § 1415(f)(1)(A) ("Whenever a complaint has been received . . . the parents *or the local educational agency*

---

[4] We recognize that the District Court is currently considering this issue in deciding the Department's motion to dismiss. However, because exhaustion is a question of subject-matter jurisdiction, it should have been addressed first; if exhaustion were required, the District Court would have lacked jurisdiction to enter the injunction.

*involved in such complaint* shall have an opportunity for an impartial due process hearing." (emphasis added)); N.J. Admin. Code § 6A:14-2.7(h) ("When a parent requests a due process hearing . . . *the district board of education shall have an opportunity to resolve the matter . . . .*" (emphasis added)). E.M. does not challenge the action of her local public-school system. Rather, she agrees with what her local public-school system has decided: that she attend LCEC while attending classes with TLC's regular-education students. It is the Department that would prevent her from doing so, and it is the Department's action she wishes to challenge. Given that the administrative process "cannot grant relief" because the "hearing officer lacks authority to provide a remedy," *Komninos*, 13 F.3d at 778, her failure to exhaust her administrative remedies does not deprive the District Court of jurisdiction.

We therefore turn to the second issue: does § 1415 contemplate and allow E.M.'s suit against the Department? The answer is yes. E.M. believes that the Department's interpretation of the scope of LCEC's approvals is incorrect, arbitrary, and capricious. By imposing its interpretation of the scope of LCEC's approvals on E.M., the Department would prevent E.M. from having her IEP implemented as worded: that she attend LCEC *and* integrated classes with students at TLC. Because receiving an education in compliance with her IEP is a part of receiving a free appropriate public education under IDEA, *see* 20 U.S.C. § 1401(9)(D), the Department is thus arguably interfering with her ability to receive a free appropriate public education. The entire purpose of § 1415 is to provide parents "procedural safeguards with respect to the provision of a free appropriate public education." *Id.* § 1415(a).

11

Moreover, under IDEA, a parent who prevails in a lawsuit may receive reasonable attorneys' fees and costs. *Id.* § 1415(i)(3)(B)(i)(I). Importantly, a district court can award attorneys' fees to "a State educational agency" if it is the "prevailing party" and the underlying action was frivolous or was presented for an improper purpose. *Id.* § 1415(i)(3)(B)(i)(II)-(III). Therefore, because E.M.'s claim is one that concerns the provision of a free appropriate public education to her and because the Department is a permissible party in an IDEA lawsuit in a federal district court, we conclude that E.M.'s lawsuit against the Department is a "proceeding[] conducted pursuant to [§ 1415]."

The Department's arguments to the contrary rely on cases we find inapplicable. First, the Department relies on Judge Becker's opinion in *DeLeon v. Susquehanna Community School District*, 747 F.2d 149 (3d Cir. 1984), and the Sixth Circuit's opinion in *Tilton ex rel. Richards v. Jefferson County Board of Education*, 705 F.2d 800 (6th Cir. 1983). In *DeLeon*, we considered whether a change in the way a child was transported to school was subject to the "stay-put" rule. 747 F.2d at 150. Previously, the school district paid the child's parent to drive him to school; the school district began arranging group transportation instead. *Id.* at 151. We concluded that the change was not subject to the "stay-put" rule because the child's educational placements were not changed. *Id.* at 153-54. The Department, however, emphasizes certain dicta from the opinion. Judge Becker opined that "possibly requiring school districts to raise substantial funds by taxation or transfer of appropriations" in order to keep a school open that a school district intended to close for financial reasons "raises substantial and sensitive separation of powers problems." *Id.* at 153 n.8.

In *Tilton*, a local school district planned to close a full-year education program for students with disabilities for budget reasons and to transfer the students to 180-day programs. 705 F.2d at 802, 804. The Sixth Circuit held that the "stay-put" rule did not apply to the district's plan to close the programs for budgetary reasons because "nothing in the legislative history or the language of the Act implies a legislative intent to permit interested parties to utilize the automatic injunctive procedure of [the 'stay-put' rule] to frustrate the fiscal policy of participating states." *Id.* at 804. The court noted that education "'is committed to the control of state and local authorities'" and that applying "stay-put" to a budgetary decision "would effect a transfer of power." *Id.* (quoting *Epperson v. Arkansas*, 393 U.S. 97, 100 (1968)). Therefore, the Sixth Circuit held, challenging the financial decision to close schools was not something that triggered the "stay-put" rule. *Id.* at 804-05.

From these cases, the Department would have us craft a rule that exempts state regulation of public and private schools from the reach of a § 1415 action. Both *DeLeon* and *Tilton* suggest that certain types of state or school district action—namely funding decisions—are not the proper subjects of a suit under IDEA. However, E.M.'s claim does not raise the same concerns as the hypothetical challenge in *DeLeon* and the actual challenge in *Tilton*. Those cases were concerned with preventing the "stay-put" rule from intruding on areas of state authority with which IDEA has only a tangential relationship—such as a budgetary decision.

This is key, we think. E.M.'s claim focuses on a responsibility of the state educational agency under IDEA: proper regulation of private schools to which local public-school districts will send students with disabilities. *See* 20 U.S.C. § 1412(a)(10)(B). If the Department fails to do this

13

properly, it has directly breached one of its obligations under IDEA. In contrast, fiscal and administrative decisions may impact the education that a student receives under IDEA, but only indirectly; reallocating funds, for example, does not itself violate IDEA. The fact that E.M. challenges the way in which the Department performs one of its obligations as a state educational agency under IDEA demonstrates that E.M.'s claim falls within the ambit of § 1415.

The Department next relies on *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980). In *O'Bannon*, federal and state regulators decided to end Medicare and Medicaid's relationship with a nursing home because it "no longer met the statutory and regulatory standards for skilled nursing facilities." *Id.* at 775-76. Residents residing at the facility by virtue of Medicaid would have been forced to move to a different nursing home or else pay their own way. *Id.* at 776. The residents wanted a due process hearing before the relationship was discontinued and for Medicaid to continue to pay for their continued residence at the nursing home in the meantime. *Id.* at 777. The Supreme Court determined that the residents lacked "an interest in receiving benefits for care in a particular facility that entitles them, as a matter of constitutional law, to a hearing before the Government can decertify that facility." *Id.* at 784. This was because Medicaid did not "confer a right to continued residence in the home of one's choice"; it only conferred "the right to choose among a range of *qualified* providers." *Id.* at 785. Because the end of the relationship "does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility," no due process interest was triggered. *Id.* at 785-86.

The fact that *O'Bannon* is a constitutional due process case is what distinguishes it from this one. The residents in

14

*O'Bannon* were seeking to find an interest sufficient to trigger the protections of the Due Process Clause, and the Court concluded that no such interest existed. E.M. does not need the Due Process Clause of the Constitution to get an injunction here. If she can show that she has begun a "proceeding[] conducted pursuant to [§ 1415]" and that she faces a change in her "then-current educational placement," IDEA grants her an injunction. *O'Bannon* does not help us determine whether the first of these requirements is met, which is what we consider here.

Finally, the Department relies on *Dima v. Macchiarola*, 513 F. Supp. 565 (E.D.N.Y. 1981), and *Corbett ex rel. Corbett v. Regional Center of the East Bay, Inc.*, 699 F. Supp. 230 (N.D. Cal. 1988). In *Dima*, the district court denied a "stay-put" injunction against the local school board's decision not to renew a contract with a private school, which would result in the transfer of students with disabilities to a different school. 513 F. Supp. at 566-68. In *Corbett*, the district court modified a pre-existing "stay-put" injunction to allow the state Department of Social Services proceedings to revoke the operating license of a facility to operate to move forward. 699 F. Supp. at 230-32. We do not think these cases are helpful to the issue of whether E.M.'s lawsuit is a "proceeding[] conducted pursuant to [§ 1415]." *Dima* concluded that "the transfer of these handicapped students" did not "constitute[] a change in 'placement.'" 513 F. Supp. at 568. *Corbett*, in turn, relied on *Dima*. 699 F. Supp. at 232.

15

Therefore, these cases do not persuade us that E.M. cannot sue the Department under § 1415.[5]

We are satisfied that E.M.'s suit against the Department is a "proceeding[] conducted pursuant to [§ 1415]." However, this implies nothing about the merits of her claims against the Department. The merits of the underlying suit have no impact on whether "stay-put" applies in a given case, and we express no opinion on them here. *See Drinker*, 78 F.3d at 864 (stating that "stay-put" applies "regardless of whether the[] case is meritorious or not"). Although there are circumstances when federal courts should not and cannot intervene in the licensing decisions of the State, we also envision circumstances in which federal law requires that we intervene, such as if the licensing decision is based on an impermissible motive under IDEA. Whether the particular action challenged is something that the federal courts can remedy must be determined in each case. Because a "stay-put" injunction applies regardless of the merits, we take this brief opportunity to emphasize that speed of a final resolution in these cases is in the best interest of all parties.

―――――――――――――

[5] Our dissenting colleague embraces the Department's argument, stating that "the 'stay put' provision does not apply when the change in educational placement results from a broad policy decision grounded in matters of licensing, administration, or fiscal policy." Dissent at 6-7. However, our colleague supports this statement, predominantly, with cases holding that *no* change in educational placement occurred. *See, e.g.*, *id.* at 7 (citing cases). As explained below, we think that position has some force. However, we think that whether a change in placement has occurred is a different question than whether litigants can ever challenge a "broad policy decision" through IDEA.

16

2.

Because E.M.'s suit is a "proceeding[] conducted pursuant to [§ 1415]," she is entitled to remain in her "then-current educational placement" under § 1415(j). Therefore, she is entitled to an injunction should the Department attempt to alter her "educational placement." E.M. says that by instructing LCEC not to allow its public-school students in classrooms with regular-education students from TLC, which is required by her IEP, the Department is attempting to alter her "educational placement." The Department responds that E.M. can receive the same services provided by LCEC at a different school, so her "educational placement" is unchanged. To resolve this dispute, we have to address what "educational placement" means in this context.

The term "educational placement" is not defined by IDEA or its implementing regulations. Nevertheless, this Court has previously interpreted the term to mean "whether [a change] is likely to affect in some significant way the child's learning experience." *DeLeon*, 747 F.2d at 153. This is because a change in the child's educational placement "should be given an expansive reading, at least where changes affecting only an individual child's program are at issue." *Id.* We also consider the IEP of the child that is "actually functioning when the stay-put is invoked." *Drinker*, 78 F.3d at 867 (internal quotation marks omitted).

E.M. argues, and the District Court held, that her current educational placement is to implement her IEP *at LCEC and TLC*. E.M. finds support for this position in *Drinker*; we held there that because the child's IEP team "had determined the appropriate placement and location of services" for the child to be a particular school, that school was the child's educational placement. *Id.* It also accords with the notion that an IEP for a child should identify the specific

17

locations at which the child is to receive special education services. 20 U.S.C. § 1414(d)(1)(A)(i)(VII).

The Department, however, argues that "educational placement" does not mean a specific school when a state or local agency acts in a way that affects a group of children, rather than in a way directed towards any individual child specifically. Instead, when the agency acts in a way that affects a group, "educational placement" means the overall educational requirements contained in the IEP. The Department contends that its actions are not targeted towards E.M. specifically, so if another school can provide E.M. with the programs included in her IEP, she is not entitled to remain at LCEC.

In support of its position, the Department cites a statement by the U.S. Department of Education in the Federal Register and a group of cases from other circuits. The Department of Education, in creating implementing regulations for IDEA, drafted and implemented a regulation corresponding to the "stay-put" rule of § 1415(j). 34 C.F.R. § 300.518(a). The regulatory "stay-put" rule uses the same term, "educational placement," that the statute uses. The term is not defined in the regulations even though it is a commonly used term throughout the implementing regulations. The lack of a definition was the subject of comments when the regulations were first publicized. The Department of Education noted that "[a] few commenters suggested that the term 'educational placement' be defined to include *location*, supports, and services provided." Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46,540, 46,687 (Aug. 14, 2006) (emphasis added). The Department decided not to define the terms, although "[t]he Department's longstanding position is that placement refers to the provision

of special education and related services *rather than a specific place, such as a specific classroom or specific school.*" *Id.* (emphasis added).

The Courts of Appeals have also generally come to the same conclusion. In *Concerned Parents & Citizens for the Continuing Education at Malcom X (PS 79) v. New York City Board of Education*, the local board of education planned to close a school for budgetary reasons and transfer the students with disabilities to other schools; the parents of those children sought a "stay-put" order barring the closure while they challenged it. 629 F.2d 751, 752 (2d Cir. 1980). The Second Circuit held that "stay-put" was not triggered because the board of education was not changing the students' educational placements even though they were being transferred. *Id.* at 753-54. The court reasoned that "educational placement" referred to "the general type of educational program in which the child is placed" or "the existence and classification of a handicap, and the most appropriate type of educational program for assisting a child with such a handicap." *Id.* at 753-54.

In *AW ex rel. Wilson v. Fairfax County School Board*, a student was transferred from his preferred school for disciplinary reasons and challenged the transfer as being in violation of the "stay-put" rule. 372 F.3d 674, 676-77 (4th Cir. 2004). The Fourth Circuit found that "stay-put" did not apply because the student's "educational placement" was not the specific school he attended but "the environment in which educational services are provided." *Id.* at 682. As long as the new school "replicate[d] the educational program contemplated by the student's original assignment," there was no change in "educational placement." *Id.*

In *Knight ex rel. Knight v. District of Columbia*, a child objected to a new IEP that would transfer him from a

private school to a public school for the following school year and sought an injunction under the "stay-put" rule while he challenged the transfer. 877 F.2d 1025, 1026-27 (D.C. Cir. 1989). The D.C. Circuit found that "stay-put" did not apply because "the only sense in which . . . the two schools are dissimilar is that [one] is a private school and [the other] is a public school." *Id.* at 1028. The court concluded that as long as the public school was able to implement the child's IEP there was no change in the child's "educational placement." *Id.*[6]

These decisions indicate that, at least in some situations, a child's "educational placement" does not include the specific school the child attends. But in each of these decisions, an alternative location provided sufficient services to satisfy the requirements of the student's IEP. *See Concerned Parents*, 629 F.2d at 756 (noting that the record reflected "a good faith effort to preserve intact as far as possible the basic educational programs that the transferred children had formerly enjoyed"); *AW*, 372 F.3d at 683 (finding nothing in the record to indicate that "the new location cannot fairly be described as an identical setting"); *Knight*, 877 F.2d at 1029-30 (finding no evidence in the record that the student would be unable to obtain similar educational benefits at the new school).

---

[6] The Department also relies on *White ex rel. White v. Ascension Parish School Board*, 343 F.3d 373 (5th Cir. 2003). That case is not a "stay-put" case. However, the Fifth Circuit did conclude in that case that "educational placement" as that term is used in IDEA "means educational program— not the particular institution where that program is implemented." *Id.* at 379.

These decisions are consistent with our opinion in *DeLeon*. Judge Becker in *DeLeon* noted that "[t]he question of what constitutes a change in educational placement is, necessarily, fact specific." 747 F.2d at 153. The record in *DeLeon* did not indicate that changes to the student's transportation plan would have a "substantial, detrimental impact" on the student's education. *Id.* at 154. Judge Becker also noted that decisions concerning "the interests of a large number of children" involve "entirely different problem[s]" than decisions that affect or are targeted towards one child. *Id.* at 153. This is because decisions affecting a group as a whole "are broad 'policy' decisions rather than individual choices concerning particular children." *Id.*

The Eighth Circuit summarized this dichotomy well:

> A transfer to a different school building for fiscal or other reasons unrelated to the disabled child has generally not been deemed a change in placement, whereas an expulsion from school or some other change in location made on account of the disabled child or his behavior has usually been deemed a change in educational placement that violates the stay-put provision if made unilaterally.

*Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 834 (8th Cir. 2002) (per curiam) (agreeing with the district court's factual determination that changing the location of instruction for a student from his home to a school effected a change to his educational placement); *see also Bd. of Educ. of Cmty. High Sch. Dist. No. 218 v. Ill. State Bd. of Educ.*, 103 F.3d 545, 549 (7th Cir. 1996) ("[W]e adopt our sister circuits' fact-driven approach. We accept as the outer

21

parameters of 'educational placement' that it means something more than the actual school attended by the child and something less than the child's ultimate educational goals."). This dichotomy is appropriate because one of the primary concerns of IDEA was to prevent schools or educational agencies from excluding "hard-to-handle disabled students" from classrooms. *Honig v. Doe*, 484 U.S. 305, 324 (1988).

We are operating in this case in a gray area. The facts of this case are distinguishable from the decisions involving school closures for general budgetary or administrative reasons. *See, e.g.*, *N.D. ex rel. Parents Acting as Guardians Ad Litem v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010) (concluding that a reduction in school days "affect[s] all public schools and all students, disabled and non-disabled alike"); *Tilton*, 705 F.2d at 805 ("[I]f a state or local agency must discontinue a program or close a facility for purely budgetary reasons, the requirements of [the stay-put provision] do not apply."). The Department's "no mainstreaming" directive does not affect disabled and non-disabled students equally—it impacts E.M. substantially more than her non-disabled peers. This case occupies a middle ground between the broad policy decisions and the individually targeted actions described in *DeLeon*.

The language of IDEA is broad enough to cover circumstances other than those that purely address a single student. The State's legitimate interest in regulating private schools like LCEC and TLC is such that it can rightly communicate its licensing concerns to the administrators of those schools, but it cannot wield its regulatory authority in a fashion that immediately and without notice—or *any* proposed alternative—requires a child's IEP to be dispensed with while administrators are in discussions about licensing

22

requirements. A main point of the "stay-put" provision in IDEA is to protect individual students while educational regulators and those interested in a child's education are working out disputes. We are not suggesting that E.M.'s "educational placement" requires that she stay at LCEC. We are saying rather that her "placement" is at least the program identified in her IEP and that the Department's actions in this particular case are, if there is no viable educational alternative, recognizable as effecting a change in that placement and hence subjecting the Department to a "stay-put" injunction of the limited variety imposed by the District Court.

3.

To reiterate, we have no occasion to decide whether moving E.M. to another school would constitute a change in "placement." One aspect of this case that must be particularly frustrating to E.M.'s parents and perhaps to E.M. herself is that nothing in the course of the disputations between E.M.'s school and the Department seems to have taken account of whether another school is available to satisfy the requirements of E.M.'s IEP. She has been caught in a bureaucratic crossfire in which scant attention, if any, has been directed at alternatives to satisfy her educational needs. The District Court appears to have understood that problem and sought to prevent E.M. becoming a casualty of evolving discussions on the future of her present school. We do not understand the District Court to have taken any position on whether the "stay-put" injunction will survive a decision by the Department to close LCEC or by the local public-school system to transfer students like E.M. to another school capable of implementing their IEPs. Nor do we. Instead, given the unsettled state of the record (which does not even contain a copy of E.M.'s IEP, just a summary from provisions

of the Verified Complaint), we think it best to remand the case, with the "stay-put" injunction in place, for further development of the record, including whether other educational alternatives are available to E.M. and her family as a new school year approaches.

IV.

For these reasons, we remand this case to the District Court for additional fact finding consistent with this opinion.

SHWARTZ, Circuit Judge, dissenting.

At its core, this case is a licensing dispute between the New Jersey Department of Education ("NJDOE") and the Learning Center for Exceptional Children ("LCEC"). Thwarted at the state administrative level, LCEC filed this lawsuit, joined by E.M. and her parents, in an effort to forestall NJDOE's actions. Plaintiffs have attempted to stop NJDOE by relying on a provision of the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1415, that is meant to prevent local agencies from changing a child's education while the school and the parents address their disputes about the child's educational placement. As more fully explained herein, § 1415 does not provide a basis for relief here because: (1) Plaintiffs do not satisfy the unambiguous statutory prerequisites; and (2) this provision does not cover challenges to a state's licensing decision that equally applies to all students at a particular school. For these reasons, I dissent.

I

As the Majority has explained, E.M. is a disabled student receiving special education services at LCEC pursuant to an individualized education plan ("IEP") devised by her parents and the Hoboken School District. Her IEP requires that a portion of her education be conducted with typically developing peers. This is known as "mainstreaming." App. 21. Because LCEC only enrolls public school special education students, it arranged for students at its sister school, Today's Learning Center, which enrolls private school general education students, to participate in activities with LCEC students.

1

The NJDOE has asserted that LCEC is not authorized to educate private school general education students alongside public school special education students. When LCEC failed to assure the NJDOE that such education was not occurring, NJDOE placed LCEC on conditional approval status, which meant it could not accept new students. LCEC, which consequently lost students (and revenue), construed this directive as barring mainstreaming, thereby limiting its ability to educate E.M. according to her IEP and contravening the IDEA's goal of ensuring that students are educated in the least restrictive environment possible.

E.M. is caught in the cross-fire of this regulatory dispute: her IEP requires mainstreaming, but the school she attends cannot provide it. E.M. has invoked § 1415(j), IDEA's "stay put" provision, to enjoin the NJDOE from interfering with the mainstreaming component of her IEP while the dispute between the NJDOE and LCEC remains unresolved. The able District Judge, confronted with the Plaintiffs' frequently shifting positions on the relief sought and the basis for it, relied upon § 1415(j) and granted E.M. relief.

The narrow issue before us is whether the IDEA's "stay put" provision is an appropriate mechanism to provide the relief E.M. seeks, namely the ability to obtain uninterrupted mainstreaming opportunities at LCEC. Because Plaintiffs have not satisfied the conditions for obtaining "stay put" relief under § 1415, E.M. is not entitled to an injunction under this provision. In addition, because Plaintiffs are, in effect, challenging a state regulator's policy that applies to all children at the school, rather than a local educational agency's decision specifically concerning E.M.'s

2

IEP, the "stay put" provision does not apply and cannot provide a basis to enjoin the NJDOE's regulatory actions.

## II

As the Majority thoroughly explains, under the IDEA, parents and guardians play a central role in the education of their special needs children. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005); Honig v. Doe, 484 U.S. 305, 308 (1988). To this end, they participate in the creation of an IEP and must be provided with "[w]ritten prior notice" whenever the "local educational agency . . . proposes to initiate or change" or "refuses to initiate or change" the "educational placement of the child." 20 U.S.C. § 1415(b)(3). If the parent is dissatisfied, then he or she may "present a complaint," to which the local educational agency must respond. Id. § 1415(b)(6), (c)(2)(B). The parents are then entitled to an impartial hearing, an appeal to the state educational agency, and judicial review of the state educational agency's decision. Id. § 1415(f)(1)(A), (g).

Recognizing that these due process safeguards may result in lengthy proceedings, Congress enacted a "stay put" provision that "protects the status quo of a child's educational placement," C.H. ex rel. Hayes v. Cape Henlopen Sch. Dist., 606 F.3d 59, 72 (3d Cir. 2010), by preventing "school districts from effecting unilateral change in a child's educational program" during the proceedings. Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S., 96 F.3d 78, 83 (3d Cir. 1996). The "stay put" provision provides:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the

3

State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public program until all such proceedings have been completed.

20 U.S.C. § 1415(j).[1] When read together with the IDEA's due process safeguards, the "stay put" provision is only triggered (1) during the pendency of proceedings conducted under § 1415 (2) when initiated by a parent who files a due process complaint (3) in response to a proposed change in the student's educational placement. None of these prerequisites are met.

Plaintiffs filed this action in District Court without first initiating a proceeding under § 1415. Proceedings under § 1415 focus on the individual student's education, "includ[ing] the conduct and development of evaluations, eligibility determinations, IEPs, and educational placement." Michael C. ex rel Stephen C. v. Radnor Twp. Sch. Dist., 202 F.3d 642, 654 (3d Cir. 2000). No such proceeding concerning E.M.'s education has been initiated. Although the Majority devotes pages to discussing whether this case is a

---

[1] Because the IDEA's predecessor statutes contained a "stay put" provision similar to that of the IDEA, we may properly look to cases that predate the IDEA for guidance in interpreting its "stay put" provision. See Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 186 (3d Cir. 2005); Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1206 (3d Cir. 1993).

4

"proceeding" under § 1415, the proper inquiry is whether there exists a separate pending § 1415 proceeding, such as a due process complaint or an appeal of a ruling on such a complaint. Because "stay put" operates only "[d]uring the pendency" of such a proceeding, and no such proceeding has been initiated, § 1415's "stay put" provision simply does not apply. See Moss by Mutakabbir v. Smith, 794 F. Supp. 11, 14 (D.D.C. 1992) (holding that a federal action to enforce the "stay put" provision is not itself a pending proceeding under § 1415 that triggers "stay put").

Moreover, as the Majority acknowledges, there is no evidence that a change in E.M.'s educational placement has been proposed or has occurred as the plain wording of § 1415 requires. The present record does not show that the Hoboken School District has taken steps to change E.M.'s IEP, that it intends to move E.M. to a different school with a different educational program, or that she presently lacks the mainstreaming opportunity that has been described as being part of her IEP.[2] Indeed, even the Majority cannot dispute that the record is silent as to whether there has been any actual or proposed change in E.M.'s educational placement.[3]

---

[2]As the Majority correctly notes, E.M.'s IEP is not part of the record and the only information about it comes from assertions in the pleadings.

[3] To the extent Plaintiffs argue that E.M.'s educational placement has changed because LCEC no longer provides mainstreaming, they have asserted the wrong claim. The proper vehicle to challenge a failure to provide mainstreaming consistent with the requirements of E.M.'s IEP is a claim against the Hoboken School District for

5

The majority also discusses exhaustion and concludes that it is not required here because the IDEA does not allow a parent to challenge a state agency's licensing decision but rather provides a means to challenge changes to an individual's educational placement. For reasons that I will explain, I agree. Indeed, that reasoning underscores why this is not a proceeding about E.M.'s educational placement covered by § 1415.

For these reasons, Plaintiffs have not satisfied the prerequisites to obtain a "stay put" order under § 1415 and, therefore, on this record, relief on that basis should not have been granted.

III

Plaintiffs' reliance on the "stay put" provision fails for an additional reason. Even if Plaintiffs would otherwise satisfy the requirements for a change in educational placement under § 1415, they cannot overcome the general rule that the "stay put" provision does not apply when such a change results from a broad policy decision grounded in matters of licensing, administration, or fiscal policy, as opposed to a decision about an individual student. See, e.g. N.D. ex rel. Parents Acting as Guardians Ad Litem v. Haw. Dep't of Educ., 600 F.3d 1104, 1117 (9th Cir. 2010) (state implementation of furloughs that closed schools on Fridays was a state-wide administrative decision that did not constitute a change in placement triggering the "stay put" provision, although it could give rise to a failure to implement

_____

"failure to implement" her IEP. See Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000).

6

claim); <u>Weil v. Bd. of Elementary & Secondary Educ.</u>, 931 F.2d 1069, 1073 (5th Cir. 1991) (noting that "if the change in 'educational placement' is necessitated by the closure of a facility for reasons beyond the control of the public agency, the 'stay-put' provisions . . . do not apply"); <u>DeLeon v. Susquehanna Cmty. Sch. Dist.</u>, 747 F.2d 149, 153, 153 n.8 (3d Cir. 1984) (distinguishing cases that involved "broad policy decisions" that "could interfere with resource allocation" and applying "an expansive reading" to "change in educational placement" where "the decision involved is one that affects the educational program of an individual child" (internal quotation marks and citations omitted)). While the Majority correctly points out that many cases that have refused to apply the "stay put" provision to counteract policy decisions have involved school closures due to budget allocation decisions, the same logic applies to similar state regulatory interests. Setting state educational policy, accrediting particular schools, and making difficult prioritization decisions through the budgetary process are all essential facets of the NJDOE's regulatory role.

There are several reasons for denying individual plaintiffs the ability to invoke the "stay put" provision when they are challenging a system-wide policy or decision. First, "nothing in the legislative history or the language of the [IDEA] implies a legislative intent to permit interested parties to utilize the automatic injunction procedure of [the 'stay put' provision] to frustrate the" state's policy decisions. <u>Tilton by Richards v. Jefferson Cnty. Bd. of Educ.</u>, 705 F.2d 800, 804 (6th Cir. 1983); <u>N.D.</u>, 600 F.3d at 1116 ("Congress did not intend for the IDEA to apply to system wide administrative decisions," and thus the "stay put" provision does not apply where a program or school is closed due to budgetary

7

reasons). To the contrary, Congress had two goals in enacting the procedural protections of § 1415: (1) "to prevent the erroneous identification or classification of children as handicapped and the impairment of their subsequent education by ensuring that parents would be afforded prior notice and an opportunity to participate in such fundamental determinations," Concerned Parents, 629 F.2d at 754;[4] and (2) to prevent the "'total exclusion' of disabled children" from school and their warehousing in specialized institutions, N.D., 600 F.3d at 1115 (quoting Honig, 484 U.S. 325 n.8). To address this latter concern, the "stay put" provision "strip[ped] schools of the unilateral authority [they] had traditionally employed to exclude disabled students from school and to protect children from any retaliatory action by the agency." N.D., 600 F.3d at 1114 (internal quotation marks, alterations, and citations omitted); 20 U.S.C. § 1400(c)(2)(B). Because a policy decision that applies to all students "does not conflict with Congress's intent of protecting disabled children from being singled out," N.D., 600 F.3d at 1117, § 1415 is not a mechanism for challenging such decisions.

Second, permitting the "stay put" provision to be employed to challenge state policy decisions would effect a transfer of power from the state to parents. Tilton, 705 F.2d at 804 (state and local obligations under the IDEA do not

---

[4] See also Tilton, 705 F.2d at 804; S. Rep. No. 94-168, 94th Cong., 1st Sess. 26 (1975) (showing the Senate Committee was "deeply concerned about practices and procedures which result in classifying children as having handicapping conditions when, in fact, they do not have such conditions.")

8

result in an abdication of control to the parents over matters concerning the allocation of a school system's educational resources); N.D., 600 F.3d at 1117 ("To allow the stay-put provisions to apply [to forestall furloughs] would be essentially to give the parents of disabled children veto power over a state's decisions regarding the management of its schools. The IDEA did not intend to strip administrative powers away from local school boards and give them to parents of individual children."). Relatedly, permitting an individual student to invoke the "stay put" provision to forestall system-wide actions necessitated by policy decisions, particularly budgetary concerns, "could undermine the statutory purpose of providing an appropriate education to all handicapped children." Tilton, 705 F.2d at 805 (emphasis in original). Allowing a student to use the "stay put" provision to block implementation of an action that applies to all students could obligate the state, "against its reasoned judgment, to finance a program for some handicapped children because of the bare allegations of a single interested party," and such "forced spending might well deprive other handicapped children of needed resources." Id.[5]

---

[5] Under the Majority's rule, if a system-wide decision or policy results in closing a school and if there are no viable alternative programs for a particular student, then that student would be permitted to stop the implementation of the decision or policy, even if the state had a reason for its actions. If a decision or policy resulted in a particular student having no alternatives, the answer is to create an alternative, not to require the state to allow a school to operate in contravention of the rule or policy.

9

Third, the power to approve programs and control fiscal matters is a power vested with the state. Dima v. Macchiarola, 513 F. Supp. 565, 570 (E.D.N.Y. 1981) ("Congress never intended to expand these classification safeguards to obstruct a decision by the Board or the State to retain or discard the services of a private school. . . . [T]hey must be permitted to make an independent determination regarding the suitability of private institutions to fulfill the educational and fiscal needs of the system without first according the parents and guardians a due process forum," and thus school board's refusal to contract with school was a policy decision that did not trigger the notice and hearing requirements of § 1415); Corbett for Corbett v. Reg'l Ctr. of the East Bay, Inc., 699 F. Supp. 230, 232 (N.D. Cal. 1988) (noting that an agency is "responsible for protecting the integrity of [its l]icensing system, and the health and safety of residents of licensed facilities" and holding that revocation of a service provider's license did not trigger the "stay put" provision because the state agency "must be permitted to challenge, in good faith, [a service provider's] license to operate a community care facility based on legitimate health and safety concerns"); see also White, 343 F.3d at 380 (noting that where a school district had "elected to provide services at a centralized location" rather than in a particular neighborhood, "[t]his [was] a permissible policy choice under the IDEA"); Flour Bluff, 91 F.3d at 694 (recognizing that states may choose to employ regional day schools to better "allocat[e] the[ir] limited resources" so as to "better . . . provide for its disabled students"). The IDEA recognizes that states "shall determine whether [private] schools and facilities meet the standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such

10

agencies." 20 U.S.C. § 1412(a)(10)(B)(ii). The IDEA, in effect, "expressly incorporates State educational standards." Schimmel by Schimmel v. Spillane, 819 F.2d 477, 484 (4th Cir. 1987). "Because unapproved private schools do not meet the State educational standards," the IDEA "does not require [a state's] school systems to place and fund handicapped children in unapproved private schools." Id.; see also Antkowiak by Antkowiak v. Ambach, 838 F.2d 635, 640 (2d Cir. 1988) (holding district court lacked authority to order placement at a school not approved by the state). Thus, the statute's goal of protecting individual students combined with the state's obligation to approve schools for the benefit of all students demonstrate that a statutory provision geared to protect individual students was not meant to be a mechanism to challenge decisions that apply to all students, even if an individual student is impacted by that decision in a unique way.[6]

Here, Plaintiffs seek to "[e]njoin[] the [Defendants] from enforcing N.J.A.C. 6A:14-4.7(a) in a manner that precludes LCEC from implementing the mainstreaming component of E.M.'s IEP." App. 37. This claim in effect challenges the NJDOE's licensing decision concerning LCEC. Although Plaintiffs have attempted to cast NJDOE's decision as a violation of E.M.'s IEP because enforcement of

_____

[6] This is not to say that the IDEA could never be used as a vehicle to challenge a policy decision that violates the statute nor is it to say that other avenues for relief cannot be pursued to protect the interests of an individual child. Rather, challenges to universally applicable policy decisions do not trigger an individual student's right to "stay put" under § 1415.

11

the regulation will impact her, there is no allegation that NJDOE's enforcement of the regulation targets E.M. or changes her IEP.  In fact, NJDOE's position equally applies to all LCEC students with an IEP that provides for mainstreaming.  Thus, Plaintiffs challenge a policy decision that does not trigger the "stay put" provision.  See Tilton, 705 F.2d at 805 (decision to close school "for purely budgetary reasons" did not trigger "stay put" provision); Corbett, 699 F. Supp. at 232 (revocation of a service provider's license was policy decision that did not trigger the "stay put" provision).

E.M. is entitled to every protection available to her, including a free and appropriate education in the least restrictive environment.  Nonetheless, efforts to secure these protections must be brought against the proper parties in the proper forum.

For all of these reasons, I would vacate the order granting "stay put" relief under § 1415.